*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 82**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

UTAH STREAM ACCESS COALITION,
*Appellee,*

*v.*

ORANGE STREET DEVELOPMENT,
*Appellant,*

and

STATE OF UTAH,
by and through its DIVISION OF FORESTRY, FIRE AND STATE LANDS,
*Appellee.*

No. 20150439-SC
Filed November 22, 2017

On Direct Appeal

Third District Court, Silver Summit
The Honorable Keith A. Kelly
No. 110500360

Attorneys:

W. Cullen Battle, Craig C. Coburn, Salt Lake City, for appellee Utah
Stream Access Coalition

Michael D. Zimmerman, Troy L. Booher, Erin Bergeson Hull,
Christopher E. Bramhall, Salt Lake City, Anthony W. Schofield, Peter
C. Schofield, Lehi, for appellant

Sean D. Reyes, Att'y Gen., Stanford E. Purser, Deputy Solic. Gen.,
Norman K. Johnson, Michael S. Johnson, John Robinson Jr., Asst.
Att'ys Gen., Salt Lake City, for appellee State of Utah Division of
Forestry, Fire and State Lands

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, and JUDGE CHRISTIANSEN joined.

JUSTICE DURHAM filed an opinion concurring in part and dissenting in part.

Having recused himself, JUSTICE PEARCE does not participate herein; COURT OF APPEALS ASSOCIATE PRESIDING JUDGE MICHELE M. CHRISTIANSEN sat.

---

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶ 1   Our decision in *Conatser v. Johnson*, 2008 UT 48, 194 P.3d 897, established a public easement right to incidentally touch the beds of Utah waterways for recreational or other lawful purposes. The legislature responded to this decision by enacting the Public Waters Access Act. UTAH CODE § 73-29-101 *et seq*. That Act cuts back on the easement right recognized in *Conatser*. It provides for public access rights for recreational use of public water that is "navigable water" or water "on public property." *Id.* § 73-29-201(1). In addition, the statute also recognizes access rights to public water on private property "with the private property owner's permission" and "a public right to float on public water that has sufficient width, depth, and flow to allow free passage of the chosen vessel at the time of floating." *Id.* §§ 73-29-201(2) & 73-29-202(1). This latter right includes the right to "incidentally touch private property as required for safe passage and continued movement," the right of "portage" around certain obstructions in the water, and the right to "fish while floating." *Id.* § 73-29-202(2).

¶ 2   This case presents questions concerning the interpretation and application of the Act. The plaintiff is Utah Stream Access Coalition (USAC). USAC filed this suit seeking a declaration that a one-mile stretch of the Weber River is "navigable water" to which the public has a statutory right of recreational use.

¶ 3   The district court ruled in USAC's favor. It found that the one-mile stretch of the Weber River was "navigable water." And it accordingly held that USAC had a right of access to the waters in question. We affirm. We hold that the Act invokes a legal term of art embedded in federal law. And we uphold the district court's conclusion that the stretch of the Weber River in question qualifies as "navigable" under this standard.

I

¶ 4   In 2011, USAC filed this lawsuit against Orange Street and other property owners along a one-mile stretch of the Weber River. USAC initially named the Summit County Sherriff, the Utah Division of Wildlife Resources, and the Division of Parks and Recreation as additional defendants. But the parties agreed to substitute the Utah Division of Forestry, Fire, and State Lands (the State) for these parties. And throughout the litigation, the State took a mostly neutral stance; it did not take a formal position on the questions presented.

¶ 5   USAC asserted that the disputed section of the Weber River is navigable water. And it sought declaratory relief confirming its right to use the river for recreation and an injunction barring property owners and state officials from interfering with its members' recreational use rights.

¶ 6   During the litigation, the State raised a concern about the scope of the issues before the district court—specifically the title implications of the litigation for property owners along the Weber River. In response to these and other concerns, USAC explained that it sought only recreational use rights for its members and not a title determination. Ultimately, USAC's trial brief clarified that it rooted its right of access in the Public Waters Access Act, which in its view implicated a navigability standard imported from federal law.

¶ 7   The district court held a four-day bench trial in February 2015. At trial the court heard extensive testimony on historical commercial uses of the Weber River. The evidence included testimony and documentation of log drives on the one-mile segment of the river at issue in the case. After trial the court issued findings of fact and conclusions of law. It concluded that the disputed section of the river was navigable under the "navigability for title" standard set forth in federal "equal footing" law. The district court accepted the testimony of USAC's expert showing regular commercial use of the Weber River leading up to Utah's statehood. These commercial uses included transportation of railroad ties, delivery of mining timber, and floating of logs to sawmills. The district court determined, moreover, that the Weber River was essential to this commerce, as overland transportation of timber was not economically viable. And it issued an injunction preventing landowners and state officers from interfering with the recreational use rights of the public on this stretch of the river.

¶ 8   The district court also quieted title to the streambed under the one-mile stretch of the Weber River, holding that the State held title in the streambed. But USAC did not assert a quiet title claim—

and it even disavowed any interest in pursuing a title determination during the litigation. And all parties on appeal acknowledge that the quiet title decision was error.

¶ 9 We accordingly reverse the district court on this point—vacating the decision to quiet title to the streambed. And because we reverse on the ground that a quiet title claim was not properly presented to the district court, we do not reach the question whether USAC would have standing to seek a title determination in these circumstances.

¶ 10 In so doing we do not take a position on who holds title to the streambed in question, or even on the question whether the State would be precluded from challenging the navigability determination here in any future case in which a title dispute may arise. Thus, we are not holding that Orange Street "still hold[s] title to the land in name only." *Infra* ¶ 45. Nor are we deciding that the navigability decision we affirm here is based on "a 'third category of water courses'" distinct from those discussed herein. *Infra* ¶ 47. We are simply holding that it was error to award a remedy (a declaration and order expressly quieting title in the State) in the absence of a specific request therefor.

¶ 11 If and when there is a title dispute over the streambed in question, it may well be that the State will be precluded from challenging the navigability determination in this case. But that will depend on the application of the law of claim preclusion or collateral estoppel.[1] The parties have not briefed that question here so it would

---

[1] The dissent views this as less an additional "remedy" and more an "inescapable . . . corollary." *Infra* ¶ 41. But the analogy to "Euclidean geometry," *infra* ¶ 41, doesn't quite hold. The right to a declaration quieting title in the State does not necessarily follow from our disposition of this case; this is no mere logical corollary—a simple "deduction" requiring "no additional proof." *Infra* ¶ 41.

A decision on the availability of this remedy may require more than a mere showing of the logical equivalence of the "navigability" question at issue here and that necessary for quieting title. A key question, for example, is whether the State is bound by the navigability determination made here under the law of issue preclusion. And because the parties stipulated that they were not seeking a quiet title determination and the State was at least arguably not a party to the proceedings, we conclude that it was error for the court to make a quiet title determination.

(Continued)

be premature for us to resolve it. And it was likewise premature for the district court to order a remedy that no party had requested.

II

¶ 12 The Public Waters Access Act states that "[t]he public may use a public water for recreational activity if" it "is a navigable water." UTAH CODE § 73-29-201(1)(a)(i). And the Act defines navigable water as "a water course that in its natural state without the aid of artificial means is useful for commerce and has a useful capacity as a public highway of transportation." *Id.* § 73-29-102(4).

¶ 13 Orange Street challenges the district court's application of these provisions on two grounds. First it challenges the legal standard employed by the district court. It notes that the statute includes its own definition of "navigable water" and claims that the statutory definition differs from the (federal) standard applied by the district court. Second, Orange Street challenges the district court's application of the navigability standard to the facts of this case. It contends that the district court erred in its determination of the navigability of the Weber River even assuming the correctness of the legal standard applied below.

¶ 14 Orange Street concedes that it failed to preserve its challenge to the legal standard applied by the district court. With that in mind, Orange Street's first argument is rightly framed in "plain error" terms. *See State v. Powell*, 2007 UT 9, ¶ 18, 154 P.3d 788. Thus, we consider the legal standard applied by the district court under a plain error standard of review.[2] *Id.* And we find a lack of plain error.

---

In so concluding we are not saying that Orange Street still holds title, *infra* ¶ 45, or that the navigability decision we affirm here is insufficient to establish title, *infra* ¶ 47. We are simply holding that it was error to award a remedy in the absence of a specific request therefor. And we leave the ultimate disposition of this question to future litigation on the matter.

[2] In so doing we do not necessarily endorse the ongoing viability of plain error review in civil cases. Nor do we repudiate it. We simply note that there is an ongoing debate about the propriety of civil plain error review. *Compare Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*, 854 F.3d 765, 783 (5th Cir. 2017) (applying criminal plain error standard to unpreserved error in civil case), *with Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 430 (7th Cir. 2008) (limiting plain error review in civil cases), *and Image Tech. Servs., Inc. v.*

(Continued)

¶ 15 We also affirm the district court's finding of navigability. The district court's findings of fact, of course, are reviewed deferentially for clear error. *See In re Adoption of Baby B.*, 2012 UT 35, ¶ 40, 308 P.3d 382. The standard of review for the mixed determination of navigability under the facts of this case is less clear. *Id.* ¶¶ 42–44 (noting that the standard of review of mixed determinations "is sometimes deferential and sometimes not," depending on "the nature of the issue and the marginal costs and benefits of a less deferential, more heavy-handed appellate touch"). But we think that finding should be given some deference too, given the fact-intensive nature of the question of navigability. Again, however, we agree with the district court's analysis, and find that the evidence in the record supports the determination that the stretch of the Weber River in question is navigable under the Act.

A

¶ 16 We agree with Orange Street's threshold point: the question of "navigability" under the Public Waters Access Act is decidedly a question of state law. The Act includes a statutory definition of navigability. *See* UTAH CODE § 73-29-102(4) (defining "navigable waters"). And it is that standard that governs the statutory question of navigability under Utah law.

¶ 17 We also agree that the district court looked to the federal "navigability for title" standard in its analysis. It cited federal cases in articulating the operative standard of navigability in this case. *See Daniel Ball*, 77 U.S. 557, 577 (1870), *superseded by statute as stated in Rapanos v. United States*, 547 U.S. 715 (2006); *PPL Mont., LLC v. Montana*, 565 U.S. 576, 592 (2012).

¶ 18 That said, we think the district court's reliance on federal cases was harmless error. We affirm the district court's legal standard because we find the statutory standard set forth in the Act to essentially mirror or incorporate the federal standard.

¶ 19 The statute speaks of a "water course" that "is *useful for commerce* and has a useful capacity as a *public highway of transportation*." UTAH CODE § 73-29-102(4) (emphases added). The

---

*Eastmak Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (rejecting the notion of plain error review of civil jury instructions); *see also* David William Navarro, *Jury Interrogatories and the Preservation of Error in Federal Civil Cases: Should the Plain-Error Doctrine Apply?*, 30 ST. MARY'S L.J. 1163, 1170 (1999). And we note that this court has not had an opportunity to enter this debate, and would be open to doing so in a case in which the matter is presented for our decision.

federal standard is substantially equivalent. It speaks of waters that "are used, or . . . susceptible of being used, in their ordinary condition, as *highways for commerce*, over which *trade and travel are or may be conducted* in the customary modes of trade and travel on water." *Daniel Ball*, 77 U.S. at 577 (emphases added).

¶ 20 The parallelism in terminology is striking. Both the state and federal standards define a concept of "navigability." The key operative terms of both standards, moreover, are identical. Both speak of waters used as "highways." And both refer to those "highways" being used for conducting "commerce."

¶ 21 The legislature's adoption of longstanding federal terminology is decisive. A "cardinal rule of statutory construction" says that a legislature's use of an established legal term of art incorporates "the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *FAA v. Cooper*, 566 U.S. 284, 292 (2012) (citation omitted).[3] And that rule is properly invoked here. The striking parallelism between the statutory definition and the federal standard is an indication that our legislature was adopting the "cluster of ideas" in federal law. We interpret the Public Waters Access Act to incorporate the federal standard of navigability.

¶ 22 Orange Street identifies a purported difference in the terminology of the state and federal standards. It notes that the Utah statute speaks in the present tense—of a water course that "*is* useful for commerce and *has* a useful capacity as a public highway of transportation." UTAH CODE § 73-29-102(4) (emphases added). And it claims that the Utah standard is accordingly distinct from the federal standard in at least this respect—in that the federal "navigability for title" standard is backward-looking, assessing use of waters as a "highway" for "commerce" as of the date of statehood (the relevant date under the equal footing doctrine). *PPL Mont.*, 565 U.S. at 592.

¶ 23 But this is a distinction without a difference. The statute uses the same verb tense as the federal cases. The *Daniel Ball* case, as quoted above, uses present tense verbs. It speaks of waterways that

---

[3] *See also Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 ("When the legislature 'borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952))).

"*are used*"—or even are "susceptible of being used"—as "highways for commerce." *Daniel Ball*, 77 U.S. at 563 (emphasis added). And it likewise frames the analysis of the use of such "highways" for "trade and travel" in the present tense—speaking of highways "over which trade and travel *are or may be conducted* in the customary modes of trade and travel on water." *Id.* (emphasis added). In context, however, the timeframe of the inquiry into use of waterways as highways for commerce is understood as backward-looking. *See PPL Mont.*, 565 U.S. at 592. And the present verb tense of the *Daniel Ball* formulation has always been understood, with that gloss, as backward-looking.

¶ 24 The verb-tense problem in this field stems from a distinction between the "navigability" question presented in *Daniel Ball* and that at issue in cases involving "navigability for title." *Daniel Ball* concerned the scope of Congress's power over "commerce," which has long been understood to extend to the regulation of "'all navigable waters of the United States.'" 77 U.S. at 564 (quoting *Gilman v. Philadelphia*, 70 U.S. 713, 724–25 (1865)). And in that setting the present tense formulation makes perfect sense—Congress has power to regulate a waterway if it *is* navigable. The *Daniel Ball* test has been transplanted consistently to cases involving title under the equal footing doctrine.[4] In the navigability-for-title cases the quote from *Daniel Ball* is preserved, with the present verb tense included. *See, e.g.*, *United States v. Utah*, 283 U.S. 64, 76 (1931) (quoting *Daniel Ball* including its present tense formulation). Yet the courts have long understood the test to imply a different timeframe in this setting—to look to the time of statehood.[5] And we view the Public Waters Access Act to follow this same pattern: the legislature was importing the terminology of the *Daniel Ball* test (including its present verb tense), but doing so in a manner that conveyed the navigability-for-title timeframe.

---

[4] *E.g.*, *PPL Mont.*, 565 U.S. at 591–92; *United States v. Utah*, 283 U.S. 64, 75–76 (1931); *Oklahoma v. Texas*, 258 U.S. 574, 586 & n.7 (1922).

[5] *PPL Mont.*, 565 U.S. at 592 ("For state title under the equal-footing doctrine, navigability is determined at the time of statehood . . . ."); *Utah*, 283 U.S. at 75 ("In accordance with the constitutional principle of the equality of states, the title to beds of rivers within Utah passed to that state when it was admitted to the Union, if the rivers were then navigable; and, if they were not then navigable, the title to the river beds remained in the United States." (citations omitted)).

¶ 25 The standard in the Public Waters Access Act is parallel to that set forth in the federal cases. It invokes the terminology of the federal case law. And because the federal standard is viewed as backward-looking despite its present-tense formulation, we view the Utah Act to contemplate the same timeframe: the question is whether a given water course meets the statutory standard of navigability as of the time of statehood.

¶ 26 A contrary conclusion would be hard to square with the structure of the Act. The statute contemplates two categories of water courses—those that traverse public property and those that traverse private property.[6] And it allows recreational use of water courses that traverse public property and cuts off the *Conatser v. Johnson*, 2008 UT 48, 194 P.3d 897, right of use of water courses that traverse private property.[7] Orange Street's approach contemplates a

---

[6] *See* UTAH CODE § 73-29-201(1), (3) (identifying water traversing "public property" and "navigable water" as open to recreation, but prohibiting recreational use of "public water on private property").

[7] *Compare id.* § 73-29-103(2) ("[G]eneral constitutional and statutory provisions declaring public ownership of water and recognizing existing rights of use are insufficient to overcome the specific constitutional protections for private property and do not justify inviting widespread unauthorized invasion of private property for recreation purposes where public access has never existed or has not existed for a sufficient period and under the conditions required to support recognition under this chapter[.]"), *and id.* § 73-29-103(6) ("The Legislature declares . . . its intent to foster restoration of the accommodation existing between recreational users and private property owners before the decision in *Conatser v. Johnson*, affirm a floating right recognized by the court in *J.J.N.P. Co. v. State*, and recognize adverse use as a constitutionally sound and manageable basis for establishing a limited right of public recreational access on private property in accordance with this chapter."), *and id.* § 73-29-201(1) ("The public may use a public water for recreational activity if . . . the public water . . . is on public property . . . ."), *and id.* § 73-29-203 (authorizing recreational use where an easement has been established over the private property by adverse possession), *with id.* § 73-29-201(3) ("A person may not access or use a public water on private property for recreational purposes if the private property is property to which access is restricted, unless public recreational access is established [by adverse possession as defined in the Act].").

new third category of water courses. To accept its view we would have to interpret the statute to establish public use rights for a subset of water courses that traverse private property but are open to recreation without a showing of adverse possession. We find no room in the language or structure of the statute to support this approach.

¶ 27 For these reasons we conclude that any error in the district court's decision to look to federal law was harmless. And because we find no prejudicial error we cannot reverse on the basis of any *plain* error. *Powell*, 2007 UT 9, ¶ 21 ("The third element of the plain error analysis requires that the party seeking review show that the error was harmful.").

B

¶ 28 The district court applied the above-cited standard to the evidence presented at trial. It credited evidence of regular log drives to supply the railroad, transportation of mining timbers, and the delivery of logs to sawmills at the relevant time of statehood. It also found that this commercial activity could not feasibly have taken place but for the Weber River, as there were no commercially viable overland means of transporting the timber from the forest to its destination. And on these grounds it concluded that this stretch of the Weber River was "useful [for] commerce" and was "used and susceptible of being used, in its natural and ordinary condition, as highway of commerce."

¶ 29 These findings are more than sufficient to sustain the district court's determination of navigability. As the text of the statutory definition indicates, the touchstone of navigability is commercial utility—whether a waterway is "useful for commerce" or in other words has "useful capacity as a public highway of transportation." UTAH CODE § 73-29-102(4). That touchstone is reinforced in the case law. In the words of this court:

> To meet the test of navigability as understood in the American law a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient.

*Monroe v. State*, 175 P.2d 759, 761 (Utah 1946) (quoting *Harrison v. Fite*, 148 F. 781, 783–84 (8th Cir. 1906)).

¶ 30 The nature of commercial utility may vary from region to region. "It is obvious that the uses to which the streams may be put vary from the carriage of ocean liners to the floating out of logs." *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 405 (1940) (citation omitted), *superseded by statute as stated in Rapanos v. United States*, 547 U.S. 715 (2006). "[T]he density of traffic varies equally widely from the busy harbors of the seacoast to the sparsely settled regions of the Western mountains." *Id.* at 405–06 (citation omitted). And "[t]he tests as to navigability must take these variations into consideration." *Id.* at 406.[8]

¶ 31 The evidence credited by the district court is easily sufficient under this legal framework. The controlling question is commercial utility—proof that the waterway in question is "generally and commonly useful to some purpose of trade or agriculture." *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 699 (1899) (citation omitted). And the log drive evidence in the record can adequately establish commercial utility. Log drives are a relevant "purpose of trade or agriculture," and the evidence in the record sustained both the general nature and commonality of such use.

---

[8] *See also Montello*, 87 U.S. 430, 441–42 (1874) ("It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river. It is not, however, as Chief Justice Shaw said, every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture." (citation omitted) (internal quotation marks omitted)).

¶ 32 This analysis also forecloses Orange Street's various attempts to undermine the district court's determination of navigability. First, the operative navigability test does not require proof of both commercial "trade" and passenger "travel." *Daniel Ball*, granted, uses the phrase "trade and travel." 77 U.S. at 563. It is also true that the U.S. Supreme Court decisions upholding the navigability of a waterway have cited evidence of both commercial use and passenger travel. *See, e.g.*, *United States v. Holt State Bank*, 270 U.S. 49, 57 (1926) (noting that early settlers used the water course as a "route[] for trade and travel"). But that does not render such dual evidence necessary. And we find no such requirement in the operative legal standard. The essential test, again, is commercial utility. So long as a given waterway is generally and commonly useful to a purpose of trade or agriculture it may qualify as navigable. It matters not, moreover, that the commercial utility is limited to trade and does not encompass passenger travel.[9]

¶ 33 That conclusion also overtakes Orange Street's second (and related) point—that the log drive evidence in the record failed because it was limited to periods of seasonal runoff, and was not year-round. As Orange Street indicates, "[t]he mere fact that logs, poles, and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river." *Rio Grande Dam*, 174 U.S. at 698.[10] But the evidence here was not of mere occasional commercial use. It was of regular, common use of the Weber River for log drives. And because that evidence demonstrated the commercial utility of the river it also established its navigability.

---

[9] *United States v. Oregon*, 295 U.S. 1 (1935), relied on by Orange Street, is not to the contrary. That case involved a series of very shallow lakes that largely dried up each year and had never been put to any significant commercial use as a highway of commerce. *See id.* at 15–16. And the inability to float any craft upon the water may well show that a waterway is not useful as a highway of commerce. But the *Oregon* case does not support Orange Street's position. It does not show that capacity to transport people by boat is an element of the federal navigability standard.

[10] *See also Monroe*, 175 P.2d at 761 (rejecting a navigability claim for a high mountain lake irrespective of its capacity to float a boat because its commercial utility was illusory and "navigability should not be governed by our powers of imagination to vision what we deem sufficient to make it such a public waterway").

¶ 34 Orange Street cites *Oklahoma v. Texas*, 258 U.S. 574 (1922), in support of its assertion that the Weber River is non-navigable because "[i]ts characteristics are such that its use for transportation [are] . . . confined to the irregular and short periods of temporary high water." *Id.* at 591. But again that is not the state of the record here. The evidence showed that the Weber River was used—not irregularly during rare periods of high water—but regularly and commonly for commercially viable log drives. And again that is sufficient. Where the "navigable quality of a water course . . . continue[s] long enough to be useful and valuable in transportation; and the fluctuations . . . come regularly with the seasons, so that the period of navigability may be depended upon," the water course will satisfy the navigability test even if navigable conditions are not continuous. *Monroe*, 175 P.2d at 761.[11] That standard was satisfied by the evidence in the record here.

¶ 35 We affirm on that basis. We conclude that there was sufficient evidence to support the district court's determination that the relevant stretch of the Weber River was commercially useful on a regular basis, and not merely in an occasional season of high water. And we deem that evidence sufficient to establish navigability of the river where it crosses the property at issue in this case.

### III

¶ 36 For the reasons set forth above, we affirm the district court's determination that the disputed segment of the Weber River is navigable water under the Public Waters Access Act. We also vacate the district court's decision quieting title in the State (in light of the parties' confession of error on that point).

———————————

[11] *See also PPL Mont.*, 565 U.S. at 602–03 ("While the Montana court was correct that a river need not be susceptible of navigation at every point during the year, neither can that susceptibility be so brief that it is not a commercial reality."); *Appalachian Elec. Power Co.*, 311 U.S. 377, 409 (1940) ("Nor is it necessary for navigability that the use should be continuous. The character of the region, its products and the difficulties or dangers of the navigation influence the regularity and extent of the use."); *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 121–22 (1921) (Navigability does not require that a water course "be open at all seasons of the year, or at all stages of the water.").

JUSTICE DURHAM, concurring in part, dissenting in part:

¶ 37 I concur in most of the majority opinion's analysis, but disagree with its reversal of the district court's title determination. The majority opinion reverses the district court's holding that "quieted title to the streambed under the one-mile stretch of the Weber River, holding that the State held title to the streambed." *Supra* ¶ 8. I understand the majority's hesitance to quiet title in the State when the parties stipulated that they were not seeking to quiet title. However, I believe U.S. Supreme Court precedent mandates that we recognize the State's title when a waterway is determined to be navigable and I dissent from this portion of the opinion. I would hold that a federal navigability-for-title claim is a quiet title claim. I first discuss why I believe we must hold that the State has title, then why I believe USAC has standing to bring such a claim in this case.

## I. TITLE VESTED IN THE STATE AT
## THE TIME OF STATEHOOD

¶ 38 "Upon statehood, the State gains title within its borders to the beds of waters then navigable . . . ." *PPL Mont., LLC v. Montana*, 565 U.S. 576, 591 (2012); *see also Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 370 (1977) ("[U]nder the equal-footing doctrine new States, upon their admission to the Union, acquire title to the lands underlying navigable waters within their boundaries."). Thus, if a body of water was navigable at the time of statehood, "[t]he title to the land underlying the . . . [r]iver at the time [the State] was admitted to the Union vested in the State as of that date." *Corvallis Sand & Gravel Co.*, 429 U.S. at 370; *see also PPL Mont., LLC*, 565 U.S. at 592 ("For state title under the equal-footing doctrine, navigability is determined at the time of statehood . . . ."). This test, determining the navigability at the time of statehood, is often called the federal navigability-for-title test because it is used to recognize lands that the State took title to when it joined the union. *See supra* ¶ 24; *PPL Mont., LLC*, 565 U.S. at 594.

¶ 39 Under this test, if a waterway was navigable at the time of statehood, "*the State's title to the riverbed vests absolutely* as of the time of its admission and is not subject to later defeasance by operation of any doctrine of federal common law;" only "state law governs subsequent dispositions."[12] *Corvallis Sand & Gravel Co.*, 429 U.S. at

---

[12] Additionally, as mentioned below, submerged land under navigable waters are subject to article XX, section 1 of the Utah Constitution and can only be disposed in accordance with the section. *See infra* ¶¶ 51–52.

370–71, 378 (emphasis added). Indeed, the language from United States Supreme Court precedent makes it clear that the State has always held title to those lands since the State's birth, regardless of whether a court ever has, or ever does, determine that the waterway is navigable. The State gained title to the land under all navigable waters in 1896. Thus once a district court recognizes that a stretch of river was navigable under the navigability-for-title test, it necessarily recognizes that the State has held title to the land under that section of water since 1896. *See PPL Mont., LLC*, 565 U.S. at 591 ("The title consequences of the equal-footing doctrine can be stated in summary form: Upon statehood, the State gains title within its borders to the beds of waters then navigable . . . .").

¶ 40 While the parties, and the plaintiff in particular, generally frame what issues this court determines, *see Osguthorpe v. ASC Utah, Inc.*, 2015 UT 89, ¶ 49, 365 P.3d 1201 (stating that judges are typically "barred from 'granting [] relief on issues neither raised nor tried'" (alteration in original) (citation omitted)); *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987) (stating that "the plaintiff is the master of the complaint"), parties do not have the power to argue that a waterway is navigable under the navigability-for-title test without triggering our recognition that title vested in the State in 1896. When a party brings a claim that a waterway is navigable under the federal navigability-*for-title* test, the nature of the claim itself requires the court to determine whether the State holds *title*. This is regardless of any maneuvering or erroneous legal stipulations by the litigants. *See Adkins v. Uncle Bart's, Inc.*, 2000 UT 14, ¶ 40, 1 P.3d 528 ("[A]n overlooked or an abandoned argument should not compel an erroneous result. We should not be forced to ignore the law just because the parties have not raised or pursued obvious arguments." (citation omitted)).

¶ 41 The majority characterizes the district court's declaration and order expressly quieting title in the State as a "remedy." *Supra* ¶¶ 10–11. However, the quiet title decision is not a separate remedy, but an inescapable legal corollary to a court determination that a waterway was navigable at the time of statehood under the federal navigability-for-title test. A corollary "requir[es] no additional proof following upon one just demonstrated." *Corollary*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1949). It is alternately defined as "[a] deduction, consequence, or additional inference, more or less immediate, from a proved proposition" and "[s]omething that naturally follows; a practical consequence; a result." *Id.* For example,

a well-known theorem in Euclidean geometry is the Pythagorean theorem.[13] A corollary to this theorem is that if the sides of a triangle can be written in a mathematically correct equation in accordance with the Pythagorean theorem, then it is a right triangle. This statement necessarily follows from proving the Pythagorean theorem. So, if a triangle has sides measuring 3, 4, and 5, and $3^2 + 4^2 = 5^2$ (9 + 16 = 25), it *is a right triangle*: it is an inescapable result of the mathematically correct equation. In this case, if a court determines that the elements of the federal navigability-for-title test (the lengths of the triangle) are met, qualifying as "navigable" under the standard (the equation as written from the Pythagorean theorem is mathematically correct), *then the state holds title* (the triangle is a right triangle). It is not a separate "remedy," but a "result" or "practical consequence" that "require[es] no additional proof following upon one just demonstrated." *Id.*

¶ 42 Litigation of a navigability-for-title claim necessarily leads to a determination that quiets title. That is because this court does not grant title to the State; the United States Constitution already granted title to the State at the time it was admitted into the union. *PPL Mont., LLC*, 565 U.S. at 591 (2012) ("[A] State's title to these lands [is] 'conferred not by Congress but by the Constitution itself.'" (citation omitted)). In a case such as this, we merely determine whether the waterway was navigable at statehood. At that point, we necessarily recognize that the State has held title to that land since 1896. *See, e.g.*, *Mont. Coal. for Stream Access, Inc. v. Curran*, 682 P.2d 163, 166 (Mont. 1984) ("Since the Dearborn [River] was navigable under the log-floating test at the time of statehood in 1889, title to the riverbed was owned by the federal government prior to statehood and was transferred to the State of Montana upon admission to the Union."). No stipulation by the parties can overcome the inevitable result that the State holds title to the land. Even if we remove the portion of the district court's judgment that quiets title in the State, the State still holds title whether this court recognizes it or not.

---

[13] The Pythagorean theorem states that the lengths of the sides of a right triangle are mathematically related. The square of the hypotenuse (the side that is opposite of the right angle) is equal to the sum of the other two sides of the right triangle. Often this is written as the equation $a^2 + b^2 = c^2$. This proposition has been proven in multiple ways, hence becoming a working theorem.

¶ 43 Even the State acknowledges this outcome. In its brief, the State "concedes the obvious title implications of the district court's navigability finding, and does not intend to ignore those implications." Despite this concession, the State argues that it was inappropriate for the district court to state the obvious and inescapable outcome of such a claim and hold that the State holds title to the lands at issue. It asserts that for a court to quiet title, the State must request as much. This raises some significant and troubling issues. The State is essentially arguing that it enjoys all the benefits of owning the land, as the navigability finding so obviously implies, but that it doesn't want to actually hold title to the land until it decides to bring a quiet title action.

¶ 44 I would hold that the State cannot have its cake and eat it too. First, the State cannot, over one-hundred and twenty years after it acquired title under the United States Constitution, decide it does not want title, or does not want its title to be recognized at this time. "[T]he State's title to the riverbed vests absolutely as of the time of its admission and is not subject to later defeasance . . . ." *Corvallis Sand & Gravel Co.*, 429 U.S. at 370–71. Additionally, the State has already accepted title to the lands under navigable waterways when it adopted the Utah Constitution. *See* UTAH CONST. art. XX, § 1 ("All lands of the State . . . that may otherwise be acquired, are hereby accepted."); *see also State v. Rolio*, 262 P. 987, 992–93 (Utah 1927) (stating that under article XX, section 1 the "beds of navigable waters are included as 'public lands of the state,' as 'otherwise acquired'" (citation omitted)).

¶ 45 Second, the majority's awkward determination puts landowners in untenable positions. Under the majority's opinion, Orange Street does not enjoy the rights accorded to private property owners under the Public Waters Access Act. Without title to the State being acknowledged and formally declared, Orange Street would for some purposes still hold title to the land in name only, but not in fact. Orange Street may very well be liable to pay property taxes on that land. This removes at least one incentive for the State to bring a quiet title action. If the State, and its subdivisions, can continue to receive property taxes on the land yet enjoy many of the benefits of public ownership, it may decide to never bring a quiet title action. Then we could have the odd case where the landowner sues the State to force the State to take title to the land.

¶ 46 Additionally, the majority's analysis recognizes that a navigability-for-title claim is a quiet title claim. The majority opinion includes excellent and detailed analysis on why the Public Waters

17

Access Act incorporates the federal navigability-for-title test in its definition of navigability. It concludes its analysis by stating that

> The [Public Water Access Act] contemplates two categories of water courses—those that traverse public property and those that traverse private property. . . . Orange Street's [interpretation of the Act] contemplates a new third category of water courses. To accept its view we would have to interpret the statute to establish public use rights for a subset of water courses that traverse private property but are open to recreation without a showing of adverse possession. We find no room in the language or structure of the statute to support this approach.

*Supra* ¶ 26 (footnotes omitted). I agree wholeheartedly with this statement. When we interpret the Public Waters Access Act to incorporate the federal navigability-for-title test, we are essentially saying that there are only two categories of land over which natural water runs: public land and private land. The public, under the Act, has the right to use the public land under public water, but can only use the private land under public water if the use is incidental to the public's floating rights or the public proves some sort of public easement or adverse possession under Utah Code section 73-29-203.

¶ 47 The majority's opinion rejects Orange Street's attempt to create a third category of water courses, holding that it does not comport with the "language or structure of the statute." *Supra* ¶ 26. The majority recognizes that "[t]he statute contemplates two categories of water courses—those that traverse public property and those that traverse private property." *Supra* ¶ 26. But then, just paragraphs after denouncing such an approach, the majority goes on to create a "third category of water courses": those that are navigable, but not public property. *Supra* ¶ 26. Without quieting title to the land in the State, the majority still holds that the public has almost unrestricted rights to use that land, but that the State does not have title. This discrepancy will create confusion as to how such a case should be litigated. According to the majority, the public only has use rights on public land. Thus, its opinion essentially forces private parties to prove that the State holds title to the lands underneath navigable waterways. Yet, the majority then goes on to say that the district court erred by quieting title in the State.

¶ 48 I agree with the State that we cannot "ignore" the "obvious title implications" that arise when we hold that a body of water is navigable under the federal navigability-for-title test. Because a claim that a river is navigable under the federal navigability-for-title

test is necessarily a claim to quiet title, I would address whether private parties have standing to bring such a claim.

## II. PRIVATE PARTIES HAVE STANDING

¶ 49  The majority avoids the question of whether a private party has standing to bring a claim that the State has title to the lands underlying navigable waters. *Supra* ¶ 9. Because I see a claim for navigability-for-title as being identical to a claim for quiet title, I would reach that issue and hold that Utah citizens, in some circumstances, do have standing.

¶ 50 Traditional standing exists when a person has suffered a "distinct and palpable injury" that gives it a "personal stake" in the outcome of litigation. *Utah Chapter of Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 19, 148 P.3d 960 (citation omitted). To establish such an injury, the party must show 1) that "it has been or will be 'adversely affected by the [challenged] actions," 2) "a causal relationship 'between the injury to the party, the [challenged] actions and the relief requested,'" and 3) that "the relief requested must be 'substantially likely to redress the injury claimed.'" *Id.* (alterations in original) (citations omitted). In the context of a claim that seeks to quiet title to land, the party asserting the claim must establish that it "could acquire an interest in the property created by the court's judgment or decree." *Holladay Towne Ctr., L.L.C. v. Brown Family Holdings, L.L.C.*, 2011 UT 9, ¶ 54, 248 P.3d 452 (citation omitted). Standing does not exist only for those parties "who [can] acquire [complete] title," but for those parties that could acquire *any* interest in the land. *Id.* Under United States Supreme Court precedent and our constitution, the people of this State hold an interest in the lands held by the State under the public trust doctrine, including land under navigable waters.

¶ 51 When Utah was admitted into the union, the title to the lands underlying navigable waters passed to the State. *See Mont. Coal. for Stream Access, Inc. v. Curran*, 682 P.2d 163, 166 (Mont. 1984) ("[T]itle to the riverbed [of navigable rivers] was owned by the federal government prior to statehood and was transferred to the State . . . upon admission to the Union."). However, the State is not the only party to hold an interest in the land. According to article XX, section 1 of the Utah Constitution, the State accepted those lands from the federal government to be "held in trust for the people." *See also Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 452 (1892) (stating that "the state holds the title to the lands under the navigable waters," but that "it is a title different in character from that which the state holds in lands intended for sale;" rather, "[i]t is a title held in trust for the people of the state").

¶ 52 Article XX, section 1 thus creates something akin to a traditional trust relationship, with the State acting as trustee and the people as beneficiaries. In the traditional trust relationship, the beneficiaries hold equitable title to (or an equitable interest in) the trust estate, and the trustee typically holds legal title. *In re Estate of Flake*, 2003 UT 17, ¶ 11, 71 P.3d 589 ("The nature of [a trust] is such that the legal title of the property is held by the trustee, but the benefit and enjoyment of the property resides with the beneficiaries.") *superseded by statute on other grounds as recognized in Dahl v. Dahl*, 2015 UT 79, ¶ 32, --- P.3d ---; RESTATEMENT (THIRD) OF TRUSTS § 2 cmt. d (AM. LAW INST., 2003) ("Although trust beneficiaries have equitable title, a trustee's title to trust property may be either legal or equitable. Although it is usually true . . . that the trustee has legal title, in some instances the trustee will hold only an equitable title."). Thus, the people of Utah, including the members of USAC, could obtain an interest in the lands at issue in this case if we hold that the waters are navigable.

¶ 53 While this may be the case, I would not hold that every citizen has standing to sue to establish navigability. A single citizen's interest in public land is minimal without a showing of a more concrete injury. *Cf. DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 333 (2006) (stating that the ordinary taxpayer lacks standing to sue over government expenditures because the taxpayer's "interest in the moneys of the Treasury . . . is shared with millions of others [and] is comparatively minute and indeterminable" (first alteration in original) (citation omitted)). I would require citizens to show a particularized injury in addition to their interest in the land. I believe that USAC has done so in this case.

¶ 54 Here, the members of USAC are citizens of Utah. Thus, once USAC establishes that the one-mile section of the Weber River is navigable, its members gain an equitable property interest in the lands underneath those waters. Additionally, its members were injured by the defendants' actions in restricting access to those waters. USAC's members frequently fished and waded through the stretch of the river at issue here. Once the Public Waters Access Act was passed, Orange Street and other defendants posted no trespassing signs, cutting off USAC's members' rights to wade in the river. A decree that the State owns the beds of those waters, and thereby holds them in trust for the people, would grant access to USAC and its members, thereby remedying their particularized harm. *See* UTAH CODE § 73-29-201 (granting access rights on waters that cross "public property" or that are "navigable water"). For this reason, I would hold that USAC has standing to quiet title in the State.

DURHAM, J., concurring in part and dissenting in part

¶ 55 I understand the majority's hesitance in reaching this issue. I would also hesitate to grant an unrestricted right to private parties to litigate a claim that forces the State to take title, but I think fears in that regard are unfounded because the State would almost certainly be a necessary and indispensable party in any such claim. *See* UTAH R. CIV. P. 19. I do not see any issue in this case as the State was a party. The fact that it chose to remain neutral does not alter that it was a named party. So long as it was added as a party and had notice of the proceeding, it had every right and opportunity to argue in any manner that it saw fit. If a party fails to argue for a position it wishes to take, or fails to adequately argue for that position, the position is waived. *State v. Johnson*, 2017 UT 70, ¶ 14, --- P.3d --- ("If the parties fail to raise an issue in either the trial or appellate court, they risk losing the opportunity to have the court address that issue." (footnote omitted)). The State, in this case, exercised its rights by arguing that the court should adopt the federal navigability-for-title test, but that it should not determine title. This position is untenable, as discussed above.

¶ 56 I would hold that USAC has standing to bring a claim to quiet title to the lands at issue in this case in the State and the people of Utah. Accordingly, I would affirm the district court and hold that the State gained title to the land in 1896.

--------