*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2018 UT 57**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

UTAH STATE TAX COMMISSION,
*Respondent-Appellant,*

*v.*

SEE'S CANDIES, INC.,
*Petitioner-Appellee.*

No. 20160910
Filed October 5, 2018

On Direct Appeal

Fourth District, Utah County
The Honorable Judge Samuel D. McVey
No. 140401556

Attorneys:

Sean D. Reyes, Att'y Gen., Tyler R. Green, Solic. Gen.,
Brent A. Burnett, Asst. Solic. Gen., Clark L. Snelson,
Michelle A. Lombardi, Asst. Att'y Gens., Salt Lake City,
for respondent-appellant

Nathan Runyan, Steven P. Young, Salt Lake City,
Eric S. Tresh, Jonathan A. Feldman, Atlanta, GA,
Kelly M. Klaus, Mark R. Yohalem, Los Angeles, CA,
for petitioner-appellee

Gregory S. Matson, Helen Hecht, Sheldon H. Laskin, Bruce Fort,
Lila Disque, Washington, D.C., for amici Multistate Tax Commission

Gary R. Thorup, Salt Lake City, for amici Council on State Taxation

G. Wesley D. Quinton, Farmington, for amici
Utah Taxpayers Association

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1   See's Candies (See's), a Berkshire Hathaway subsidiary, sold its intellectual property to Columbia Insurance Company, another Berkshire Hathaway subsidiary. In return, See's received shares of Columbia's stock. After the sale, See's was required to pay Columbia to use the See's trade name. See's deducted these royalty payments from its taxable income. A tax commission auditor reviewed See's[1] tax returns and called shenanigans, concluding that the transaction had been structured to permit See's to improperly reduce its taxes. Utah Code section 59-7-113 permits the Utah State Tax Commission (the Commission) to allocate income between related organizations if it is "necessary" to "prevent evasion of taxes" or "clearly to reflect the income" of the corporations. And that is what the Commission did; it allocated the royalty payment deductions back to See's as taxable income. This increased See's tax liability for the audited years.

¶2   See's appealed that assessment to the Commission, which decided that the allocation was appropriate. See's then appealed that decision to the district court, which, by statute, has the authority to conduct a trial de novo. After trial, the district court reached the opposite conclusion and allowed See's to take the deductions. To reach that conclusion, the district court analyzed section 113 to assess when the statute authorizes the Commission to allocate income between related companies. The Commission argued that it had plenary authority to allocate income whenever it, in its sole discretion, believed it was necessary to prevent tax evasion or to make a corporation's returns clearly reflect its income. See's argued that the statute should be interpreted in the same fashion as a similarly worded provision of the federal tax code. Under that interpretation, the Commission would be authorized to allocate when the transaction occurs on terms more favorable than those that two unrelated companies would reach after negotiating at arm's length.

---

[1] Apostrophe czars and sharp-eyed grammarians may take issue with our use of See's as the possessive form of See's. Although we could write "See's's," we elect not to doggedly apply grammatical rules to the point of distraction, and instead treat See's "as a kind of possessive." *See* Bryan A. Garner, *Garner's Modern English Usage* 714 (4th ed. 2016).

¶3   The district court concluded that section 113 was ambiguous. To resolve the ambiguity, the district court interpreted the section in harmony with that similarly worded section of the federal tax code. The district court credited expert testimony opining that the See's-Columbia transaction looked like one that two unrelated companies would have reached. The Commission has not challenged this finding. Based on that testimony, the district court ultimately concluded that section 113 did not permit the allocation the Commission had imposed. The Commission appeals.

¶4  Like the district court, we conclude that the language of section 113 is ambiguous. We also conclude that the district court properly looked to section 113's federal counterpart and its accompanying regulations for guidance. The original version of section 113 was lifted directly from the 1928 Internal Revenue Code. Because the Legislature modeled the original version of section 113 on its federal counterpart, we look to the federal statute's history and interpretation for guidance. We affirm.

**BACKGROUND**

¶5  See's and Columbia Insurance Company are wholly owned subsidiaries of Berkshire Hathaway.[2] In 1997, See's sold intellectual property, including its trademarks, to Columbia in exchange for Columbia stock. The value of the intellectual property was independently assessed at the time of the transaction, and Columbia tendered shares that roughly equaled the value of See's intellectual property. As part of the transaction, Columbia and See's entered into a licensing agreement to permit See's to continue using its trade name. Under the agreement, Columbia would protect and develop the intellectual property; See's would pay royalties to license the intellectual property back.

¶6  See's deducted the royalty payments from its income as a business expense. The Multistate Tax Commission (MTC)[3] audited

---

[2] "On appeal from a bench trial, we view and recite the evidence in the light most favorable to the trial court's findings." *State v. Jack*, 2018 UT App 18, ¶ 2 n.2, 414 P.3d 1063; *see also USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 8 n.3, 372 P.3d 629 ("On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." (citation omitted)).

[3] The MTC filed an amicus brief in support of the Commission. The MTC is an intergovernmental state tax agency established by the

(continued . . .)

See's deductions for the years 1995 through 1998 and concluded the deduction was proper for various states, including Utah. The MTC recommended a 10 percent disallowance of the deduction to "represent an increase in Columbia's capital and reflect See's business activities in the State." The Commission accepted the MTC's recommendations and allowed the deduction with the 10 percent disallowance. That decision is not before us.

¶7 The Commission later audited See's for the years 1999 through 2007 and disallowed the royalty deductions. In an administrative proceeding, the Commission concluded that Utah Code "section 59-7-113 precluded shifting of income through royalty payments between See's and Columbia since Columbia does not file Utah corporate franchise tax returns."[4] The Commission concluded that the royalty deduction See's claimed "would decrease See's taxable income by 75% for the audited years and thus section 59-7-113 justified the disallowance to clearly reflect See's income." The Commission did not evaluate whether the royalty was priced at arm's length or if there was a business purpose for the transaction, but did state that See's would not have entered into this deal with an unrelated corporation.[5]

---

Multistate Tax Compact. Utah Code § 59-1-801.5 art. VI. The purpose of the compact is to "[f]acilitate proper determination of state and local tax liability of multistate taxpayers," "[p]romote uniformity or compatibility in significant components of tax systems," "[f]acilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration," and "[a]void duplicative taxation." *Id.* art. I. Fifteen states and the District of Columbia are members of the compact. *Member States*, Multistate Tax Commission, www.mtc.gov/The-Commission/Member-States (last visited September 14, 2018).

[4] In Utah, insurers are taxed based on the premiums they receive, rather than the income they generate. *See* Utah Code § 59-9-101. This meant that Columbia did not pay tax on the money it received in exchange for licensing See's intellectual property back to See's.

[5] In its order, the Commission also concluded that it "does not believe that See's has taken the steps it did to criminally evade taxes." The Commission noted that "[o]ne of the outcomes of the transactions between See's and its sister corporations may have been the avoidance of taxes," but ultimately concluded that "it is not

(continued . . .)

¶8 See's sought a trial de novo of the Commission's assessment in the district court. *See* UTAH CODE §§ 59-1-601, –602.[6] Section 113's meaning became a threshold question for the court. The Commission argued that section 59-7-113 "is a stand-alone section giving the Commission authority to reallocate income if it concludes in its broad discretion there is a distortion of income for tax purposes or avoidance of income," and that the "Legislature did not intend the statute to involve interpretation by reference to federal [Internal Revenue Service] regulations." See's contended that "section 59-7-113, being virtually identical to [Internal Revenue Code section] 482, depends on the [Internal Revenue Service] regulations for interpretation and application [and that] it me[t] those regulations' requirements for taking the deduction."

¶9 The district court concluded that the language of Utah Code section 59-7-113 "appears to be unambiguous regarding the Tax Commission's ability to redistribute deductions if necessary to clearly reflect income." But the district court also reasoned that the language "is less clear regarding conditions that should exist before it undertakes that task." The court reasoned that although the Commission "enjoys broad discretion to adjust income . . . there should be some law to guide how its discretion should operate in getting [the] deductions to clearly reflect income."

¶10 In addition, the court opined that the statutory inquiry was "rooted in whether the transaction [between related companies] was arm's length." The court concluded that

> Utah income [and] franchise taxing relies heavily on federal definitions and section 59-7-113 is itself a virtual copy of [Internal Revenue Code] section 482, indicating, as provided in [a] [Utah] Attorney General Opinion and Utah case law on similar statutes cited above, the Legislature wants to use federal guidance to

necessary that the Commission find that See's has evaded taxes, given the disjunctive nature of [section 113]."

[6] A taxpayer may petition for judicial review of a Commission decision. UTAH CODE § 59-1-602(1)(a). The district court reviews the Commission's decision de novo and gives no deference to any previous Commission decision. *Id.* § 59-1-601; *T-Mobile USA, Inc. v. Utah State Tax Comm'n*, 2011 UT 28, ¶ 15, 254 P.3d 752.

interpret and apply the statute when dealing with whether a transaction is arm's length or not.

¶11 With respect to the substance of the dispute, See's called multiple expert witnesses at trial. See's economist opined that "the purpose of transfer pricing evaluation is to ensure transactions between related parties reflect fair market pricing."[7] He explained that "[t]he practice . . . has a long history in sales and in application of [Internal Revenue Code] section 482." He concluded that "the royalty rate See's paid Columbia was in the arm's length range of royalty rates specified in" transfer pricing studies performed by an accounting firm.

¶12 See's also called a tax law professor to explain that "the purpose of [Internal Revenue Code] section 482 is to put transactions between related parties on the same footing as if they took place between unrelated parties." The professor also explained that "many other states have adopted statutes which, like section 59-7-113, are virtually identical to [Internal Revenue Code] section 482," and other states "refer to the [Internal Revenue Code] thus implicitly adopting section 482." The professor concluded that "[t]he Commission simply exercised unfettered discretion to reach its decision unguided by any reasonable standard."

¶13 Through its witnesses, See's introduced an independent transfer pricing study prepared by an accounting firm. The study concluded that the See's-Columbia transaction reflected terms like those that would be reached between unrelated parties dealing at arm's length. The study concluded that "[b]ased on the financial information for the last three years . . . the net royalty payments made to [Columbia] for these intangible assets . . . are appropriate." The study also noted that "[i]n evaluating the appropriateness of this royalty rate, we confirmed that [Columbia] pays certain costs associated with these intangible assets. This net royalty rate allows See's to earn a normal return on its intangible assets."

---

[7] The objective of the transfer pricing evaluation was "to analyze a set of intercompany transactions between [Columbia] and [See's]." The study's goals were "1) to evaluate the intercompany payments between See's and [Columbia] for the last three fiscal years and 2) to assist See's and [Columbia] in estimating a range of gross and net royalty rates to be paid in the future."

¶14 The court ultimately concluded that the transfer between See's and Columbia resembled a transaction that unrelated parties dealing at arm's length could have reached. The Commission appeals.

## ISSUE AND STANDARD OF REVIEW

¶15 The Commission contends that the district court erred by interpreting Utah Code section 59-7-113 to reflect the federal arm's length transaction standard. The appropriate interpretation of a statute presents a question of law that we review for correctness. *Bagley v. Bagley*, 2016 UT 48, ¶ 7, 387 P.3d 1000.

## ANALYSIS

¶16 The Commission contends that the district court erred by looking to federal law to interpret Utah Code section 59-7-113. The Commission argues that the language and history of section 113 indicate that the Legislature made a deliberate decision that federal law should not be used to interpret section 113. See's counters that because section 113 is ambiguous, the district court properly considered its federal counterpart and accompanying regulations to define the scope of the Commission's authority.

¶17 When faced with a question of statutory interpretation, "our primary goal is to evince the true intent and purpose of the Legislature." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (citation omitted). "The best evidence of the legislature's intent is the plain language of the statute itself." *Id.* (citation omitted) (internal quotation marks omitted). Accordingly, "[w]hen interpreting a statute, we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning." *Id.* (alteration in original) (citation omitted).

¶18 When the meaning of a statute can be discerned from its language, we need no other interpretive tools. *Id.* ¶ 15. However, "when statutory language is ambiguous—in that its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis—we generally resort to other modes of statutory construction and seek guidance from legislative history and other accepted sources." *Id.* (citation omitted) (internal quotation marks omitted).

¶19 Utah Code section 59-7-113 governs the Commission's authority to allocate income between corporations owned or controlled by the same interests:

> If two or more corporations (whether or not organized or doing business in this state, and whether or not affiliated) are owned or controlled directly or indirectly by the same interests, the commission is authorized to distribute, apportion, or allocate gross income or deductions between or among such corporations, if it determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such corporations.

¶20 The Commission contends that section 113's plain language "gives the Commission broad authority to allocate income among sister corporations if it is necessary to prevent evasion of taxes or to correctly reflect corporate income earned in Utah." Essentially, the Commission argues that section 113 grants the Commission broad ranging authority to allocate income whenever it determines that allocation is necessary.[8]

---

[8] As noted above, section 113 authorizes the Commission to allocate income or deductions when necessary "to prevent evasion of taxes or clearly to reflect . . . income." UTAH CODE § 59-7-113. While the Commission's argument relies primarily on the "clearly to reflect . . . income" language, the Commission also briefly asserts that "evasion of taxes" provides an alternative basis for its allocation of See's income.

The Commission notes that "[n]o Utah court has interpreted the phrase 'to prevent evasion of taxes' in [s]ection 113." But the Commission does little to develop an argument as to what the statute should mean.

Indeed, the Commission dedicates the bulk of its argument to demonstrating that the statute draws a distinction between someone who evades taxes and someone who willfully evades taxes. The Commission also contends that an "intent to evade" implies "a conscious desire to avoid a legal requirement with which the actor knows he or she is obligated to comply" (quoting *Silver v. Auditing Div. of State Tax Comm'n*, 820 P.2d 912, 915 (Utah 1991)), and that "evade" by itself does not "suggest that evading tax means doing something illegal." But beyond proposing those distinctions, the Commission has done little to shed light on the statute's meaning.

To adequately brief an issue, an appellant's "argument must explain, with reasoned analysis supported by citations to legal

(continued . . .)

¶21 See's argues that the meaning of section 113 is not plain because it fails to give "clear directive on how . . . to go about apportioning deductions to reflect income of related corporations." (Omission in original.) In other words, the parties agree that the Commission can allocate income when the Commission has made a determination that allocation "is necessary . . . clearly to reflect the income of any of such corporations," *see* UTAH CODE § 59-7-113, but disagree about what the statute means by "necessary" and "clearly to reflect" income.

¶22 The district court parsed the ambiguous from unambiguous portions of the statute, reasoning that the statute "appears to be unambiguous regarding the Tax Commission's ability to redistribute deductions if necessary to clearly reflect income," but that "it is less clear regarding conditions that should exist before [the Commission] undertakes that task." The court noted that the statute is silent as to "what must happen if the Tax Commission thinks it is necessary to disregard the general definition of taxable income to reach a defensible redistribution clearly reflecting income."

¶23 We agree that the phrase "necessary . . . clearly to reflect the income of any of such corporations," UTAH CODE § 59-7-113, is ambiguous because it is unclear when the Commission has authority to allocate income. The statute does not plainly speak about when it is "necessary" for the Commission to intervene and what "clearly to reflect" income means. In other words, did the Legislature intend "necessary" to mean "when the Commission concludes allocation is necessary," or did it intend that "necessary" be anchored to some objective standard?

¶24 Because the language is ambiguous, we start our analysis with an inquiry into what the Legislature would have understood the language of section 113 to mean at the time the Legislature first placed that language in the code. *See LPI Servs. v. McGee*, 2009 UT 41, ¶ 16, 215 P.3d 135 ("Because the plain language of the statute is

_____

authority and the record, why the party should prevail on appeal." UTAH R. APP. P. 24(a)(8). "An appellant that fails to devote adequate attention to an issue is almost certainly going to fail to meet its burden of persuasion." *Bank of Am. v. Adamson*, 2017 UT 2, ¶ 13, 391 P.3d 196. The Commission has not given us what we would need to interpret this language and has accordingly failed to carry its burden of persuasion on appeal.

ambiguous, we turn to the legislative history to discern the legislative intent.").

## I. The Language of Utah Code Section 113

¶25 The district court concluded that the similarity between section 113 and Internal Revenue Code section 482 suggested that the Legislature intended that federal guidance be used to interpret section 113. Internal Revenue Code section 482 provides in relevant part:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.[9]

26 U.S.C. § 482.

¶26 The Commission dismisses the notion that we can derive any meaning from the similarity in the two provisions. Instead, the Commission looks to other parts of the tax code and argues that "[b]y explicitly incorporating federal tax provisions into some parts of the Utah Tax Code—but omitting I.R.C. [section] 482 from [s]ection 113—the Legislature manifested its intent that federal law would not inform the Commission's power under [s]ection 113." The

---

[9] By way of reminder, Utah Code section 59-7-113 provides:
   If two or more corporations (whether or not organized or doing business in this state, and whether or not affiliated) are owned or controlled directly or indirectly by the same interests, the commission is authorized to distribute, apportion, or allocate gross income or deductions between or among such corporations, if it determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such corporations.

Commission reasons that because the Legislature does not cite section 482 or its regulations in the language of section 113, the Legislature did not intend for these provisions to be incorporated into section 113. The Commission points to several other sections of the tax code that "define certain Utah Tax Code terms by reference to the Internal Revenue Code" to demonstrate that "[w]here the Legislature has wanted to incorporate federal tax provisions into the Utah Tax Code, it has done so explicitly."[10]

---

[10] The Commission references Utah Code section 59-7-101 in support of this argument. Section 59-7-101 does explicitly incorporate aspects of the Internal Revenue Code by adopting several of its definitions. *See* UTAH CODE § 59-7-101(23) ("'Safe harbor lease' means a lease that qualified as a safe harbor lease under Section 168, Internal Revenue Code."); *id.* § 59-7-101(24) ("'S corporation' means an S corporation as defined in Section 1361, Internal Revenue Code."). This section of the Utah Code also references a particular federal tax credit and explains how corporations receiving the federal credit should be treated. *Id.* § 59-7-101(36)(b) ("There is a rebuttable presumption that a corporation which qualifies for the Puerto Rico and possession tax credit provided in Section 936, Internal Revenue Code, is part of a unitary group."). The Commission also points to Utah Code section 59-10-103, which states that "[a]ny term used in this chapter has the same meaning as when used in comparable context in the laws of the United States relating to federal income taxes unless a different meaning is clearly required."

The Commission's argument misses the mark. Each section it references deals with federal definitions that the Legislature chose to adopt into our own tax code. Section 113 is not a definition, nor is "necessary . . . clearly to reflect the income of any of such corporations" a defined term in either the Utah or federal tax code. Although the Commission has demonstrated that the Legislature chose to adopt certain federal definitions, the Commission has not pointed to an operative provision of the code, similar to section 113, where the Legislature has explicitly referenced the Internal Revenue Code.

The Commission argues that section 59-10-103 "shows the Legislature knew how to incorporate federal tax law by reference for an entire *chapter* of the Utah Tax Code when it wanted to—and it expressly *omitted* such a chapter-wide interpretive rule for chapter 7

(continued . . .)

¶27  See's counters that because section 113 is "nearly identical" to Internal Revenue Code section 482, the language of section 113 "must be understood in light of the well-established norm of interpreting [section 113] by reference to [section] 482 and its regulations."[11] See's also argues that the arm's length transaction standard "was encompassed by the statutory phrase 'clearly to reflect the income' in federal income tax law at the time Utah enacted virtually identical statutory language." See's notes that "[f]ederal tax law governing related-party transactions had long inquired whether a transaction was 'market price' instead of 'arbitrary' or 'artificial,' and when the clear-reflection language was adopted in 1928, it embodied this 'arm's length' approach." See's argument outlines the more persuasive interpretation of section 113.

## II. The History of Section 482

¶28  Congress enacted section 482 as section 45 of the Revenue Act of 1928. Section 482 has remained substantively unchanged since then. The concepts section 482 embodies, however, date back to the War Revenue Act of 1917. *See generally* Pub. L. No. 65-50, 40 Stat. 300 (1917).

¶29 The War Revenue Act imposed a tax on "the income of every corporation, partnership, or individual" in excess of the applicable deduction. *Id.* at 303. The Internal Revenue Service (IRS) promulgated a regulation requiring "every corporation [to] describe in its return all its intercorporate relationships with other corporations with which it is affiliated." T.D. 2694, 20 Treas. Dec. Int.

---

(where [s]ection 113 is located)." Again, section 113 is not a definition, and "necessary . . . clearly to reflect the income of any of such corporations" is not a term defined in the Internal Revenue Code. Further, "[i]t is usually quite beside the point that the legislature 'knows how' to speak more explicitly. That is another way of saying that the legislature could have spoken more clearly. And typically that gets us nowhere." *Craig v. Provo City*, 2016 UT 40, ¶ 38, 389 P.3d 423 (footnote omitted). In this instance, we are not persuaded by the Commission's argument regarding federal references within the Utah Code.

[11] See's also points to the Legislature's recodification of section 113 in 1993, but because we conclude that section 482 can be used to interpret section 113, we need not address what import, if any, to ascribe to the recodification.

Rev. 294, 321 (1918). Under the regulation, the federal tax commissioner could require affiliated corporations to file a consolidated return "[w]henever necessary to more equitably determine the invested capital or taxable income." *Id.*

¶30 The regulation clarified that under the War Revenue Act, corporations were considered affiliated "when one such corporation (a) buys from or sells to another products or services at prices above or below the current market, thus effecting an artificial distribution of profits." *Id.* Stated differently, Congress enacted this provision to combat transfer pricing manipulation, and the IRS aimed its fire at transactions between related corporations on terms "above or below the current market." *Id.; see also* Reuven S. Avi-Yonah, *The Rise and Fall of Arm's Length: A Study in the Evolution of U.S. International Taxation*, 15 VA. TAX REV. 89, 95 (1995).

¶31 In 1918, Congress amended the federal tax code. As part of those amendments, Congress lifted the concept of giving the tax commissioner authority to require related companies to file consolidated returns, and transplanted it into the "Corporations" section of the tax code. Pub. L. No. 65-254, 40 Stat. 1075, 1075, 1081 (1919). Section 240 of the Revenue Act of 1918 required "corporations which are affiliated within the meaning of this section . . . [to] make a consolidated return of net income and invested capital." *Id.* at 1081.

¶32 The IRS then issued a regulation addressing affiliated corporations transacting business with each other. The regulation explained that consolidated returns are necessary to accurately determine the invested capital and net income of the entire group of affiliated entities. T.D. 2831, 21 Treas. Dec. Int. Rev. 170, 306 (1919). "Otherwise opportunity would be afforded for the evasion of taxation by the shifting of income through price fixing, charges for services and other means by which income could be arbitrarily assigned to one or another unit of the group." *Id.*

¶33 In 1921, Congress adopted the earliest direct predecessor of section 482. Like its 1918 progenitor, section 240 of the Revenue Act of 1921 addressed consolidated returns of corporations. The new section 240(d) provided that the commissioner may require a consolidated return "in any proper case, for the purpose of making an accurate distribution or apportionment of gains, profits, income, deductions, or capital between or among such related trades or businesses." Pub. L. No. 67-98, 42 Stat. 227, 260 (1921). The Senate report noted that section 240 was "necessary to prevent the arbitrary shifting of profits among related businesses." S. REP. NO. 67-275, at 20 (1921).

¶34 The section remained essentially unchanged until 1928, when Congress enacted section 45, which very closely resembles the current versions of both section 482 and Utah's section 113. Section 45, titled "Allocation of Income and Deductions," provides:

> In any case of two or more trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such trades or businesses.

Pub L. No. 70-562, 45 Stat. 791, 806 (1928).

¶35  Section 45 made a significant change from the prior versions. Rather than requiring the corporate entities to file a consolidated return, Congress gave the Commission the authority to allocate income between related entities. *See id.* The House and Senate reports explain that section 45 authorizes the Commissioner to allocate income "as may be necessary in order to prevent evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking'), and in order clearly to reflect their true tax liability." H.R. REP. NO. 70-2, at 16–17 (1928); *see also* S. REP. NO. 70-960, at 24 (1928). Concern over "the shifting of profits" and "the making of fictitious sales" indicates that Congress was still aiming to deter transfer pricing manipulation between related entities. H.R. REP. NO. 70-2, at 16–17 (1928).

¶36 During the floor discussions in the House of Representatives, Representative Charles L. Gifford of Massachusetts explained, in reference to the affiliated corporations section, that "[w]hat worries us is that any two of these corporations can get together and juggle transactions and take advantage of questionable sales to each other to get deductions. Should it be made possible or at least encourage one corporation to purposely sell to another to show a loss?" 69 CONG. REC. 605 (1927). Representative William R. Green of Iowa, in an attempt to ameliorate Representative Gifford's concerns, highlighted the Commissioner's new power: "We have a special provision in the law, section 45, that permits the bureau to allocate the income where it belongs," rather than allowing "these

corporations to place the expenses just where they want to put them." *Id.*

¶37 Taken together, this history confirms that Congress intended section 45 to provide the IRS with a tool to address transfer pricing manipulation. The phrase, originally "for the purpose of making an accurate distribution or apportionment of gains, profits, income, deductions, or capital," Pub. L. No. 67-98, 42 Stat. 227, 260 (1921), which then morphed into "necessary in order to prevent the evasion of taxes or clearly to reflect the income of any of such trades or businesses," Pub. L. No. 70-562, 45 Stat. 791, 806 (1928), indicates that it would be necessary for the Commissioner to require a consolidated return or allocate income when corporations "mak[e] fictitious sales," H.R. REP. NO. 70-2, at 16–17 (1928), engage in "the shifting of profits," *id.*, or, as Representative Green described it, "place expenses just where they want to put them," 69 CONG. REC. 605 (1927).

¶38 Section 45's history instructs that the phrase "necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such trades or businesses," Pub. L. No. 70-562, 45 Stat. 791, 806 (1928), means that allocation would be necessary in circumstances when businesses engage in transactions that parties dealing at arm's length would not enter.[12] Measuring a transaction's

---

[12] An early interpretation of section 45 confirms this view. The United States Board of Tax Appeals examined a tax deduction claimed by one company renting space from another, both of which were "owned and controlled by identical interests." *Advance Cloak Co. v. Comm'r of Internal Revenue*, B.T.A.M (P-H) P33,078, 1933 WL 4800 (1933). The Board explained that "[t]he deductibility of the amount of rental in question . . . must be seriously questioned, in view of its large amount and in consideration of the fact that the two companies are owned and controlled by identical interests." *Id.* Noting that section 45 applied, the Board concluded that "[i]t appears that the purpose of [section 45] of the income tax statutes is to place transactions between related trades or businesses owned or controlled by the same interests upon the same basis as if such businesses were dealing at arm's length with each other." *Id.* The Board concluded that the allowance of the rental deduction resulted in a distortion of income of both companies, "and in order that income may be clearly reflected an adjustment of the rental

(continued . . .)

legitimacy against what two parties dealing at arm's length might reach would help Congress ensure tax parity between related companies and non-related companies. It is this long and developed understanding that we conclude our Legislature imported into Utah law when it adopted section 45 into the Utah Tax Code in 1931.

## III. The History of Utah Code Section 113

¶39 Utah Code section 59-7-113's predecessor was originally enacted in 1931 as part of the Corporation Franchise Tax Act, 1931 Utah Laws 87, 104, and has remained substantively unchanged since then. The original version of the section, titled Section 20, "Allocation of income and deductions," provided:

> In any case of two or more trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the tax commission is authorized to distribute, apportion, or allocate gross income or deductions between or among such trades or businesses, if it determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such trades or businesses.

*Id.* at 104. Our Legislature borrowed the language of section 20 verbatim from section 45 of the Revenue Act of 1928. *See supra* ¶ 34.

¶40 We think it appropriate to derive meaning from our Legislature's choice to import a provision of federal law into our code. Indeed, other states find significance in a state legislature's choice to borrow the language of a federal statute.

¶41 Some states presume that a state legislature knew of and intended to adopt the federal interpretation of a federal statute it

---

deduction should be made." *Id.; see also Essex Broads., Inc. v. Comm'r of Internal Revenue*, 2 T.C. 523, 529 n.2 (1943).

Lest there be any lingering doubt about the meaning of this language, the Treasury Department issued Regulation 86 in 1935, which confirmed that "[t]he standard to be applied in every case [involving section 45] is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Treas. Reg. 86 § 45.45-1(b) (1935).

places in state law. For example, in California, courts "presume that when the Legislature borrows a federal statute and enacts it into state law, it has considered and is aware of the legislative history behind that enactment." *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1080 (Cal. 2010). Likewise, in Iowa, when a state statutory provision is taken from a federal statute, courts "presume [the] legislature intended what Congress intended by the language employed." *City of Davenport v. Pub. Emp't Relations Bd.*, 264 N.W.2d 307, 313 (Iowa 1978); *see also Hubbard v. State*, 163 N.W.2d 904, 910–11 (Iowa 1969) ("[W]here . . . a state legislature adopts a federal statute which had been previously interpreted by federal courts it may be presumed it knew the legislative history of the law and the interpretation placed on the provision by such federal decisions, had the same objective in mind[,] and employed the statutory terms in the same sense."). And when examining a state statute that has a federal analog, Iowa courts also look to "federal court decisions construing the federal statute" because they are "illuminating and instructive on the meaning of [the state] statute, although they are neither conclusive nor compulsory." *Davenport*, 264 N.W.2d at 313.

¶42 Other states use a slightly different approach. Rather than focusing on what the legislature intended when adopting the statute, these states acknowledge that federal legislative history can be a helpful source when interpreting state analogs. For example, in Oregon, "[w]hen the . . . legislature adopts a statute based on federal law, [the courts] may examine the legislative history of that federal law for guidance in interpreting the state statute." *State v. Bowen*, 380 P.3d 1054, 1061 (Or. Ct. App. 2016). Alabama, New Jersey, and North Dakota have approached the issue in a similar fashion. *See, e.g.*, *State Dep't of Revenue v. McLemore*, 540 So. 2d 754, 756–57 (Ala. Civ. App. 1988) ("Alabama courts, as a rule, look to federal statutory and case construction as a source of persuasive authority where, as here, a state income tax statute has been modeled after an existing federal statute."); *State v. Ball*, 661 A.2d 251, 258 (N.J. 1995) ("[B]ecause the federal statute served as an initial model for our own, we heed federal legislative history and case law in construing our statute."); *Dominguez v. State*, 840 N.W.2d 596, 601 (N.D. 2013) ("Because the North Dakota . . . statute was modeled after and does not vary in substance from the . . . [f]ederal . . . provision, we are guided by both the drafter's official comments to the proposed [federal statute] and the relevant legislative history when we are confronted with a question of statutory interpretation." (citation omitted) (internal quotation marks omitted)).

¶43 And we have employed a related interpretive tool when examining legal terms of art adopted from federal law. In *Utah Stream Access Coalition v. Orange Street Development*, we concluded that "[t]he legislature's adoption of longstanding federal terminology is decisive." 2017 UT 82, ¶ 21, 416 P.3d 553. "A 'cardinal rule of statutory construction' says that a legislature's use of an established legal term of art incorporates 'the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" *Id.* (quoting *FAA v. Cooper*, 566 U.S. 284, 292 (2012)).

¶44 In *Utah Stream Access*, we reviewed a district court's interpretation of the term "navigable water" found in Utah Code section 73-29-201(1)(a)(i). *Id.* ¶ 12. The Public Waters Access Act defines the term "navigable water." UTAH CODE § 73-29-102(4). But the district court relied on the federal interpretation of "navigable waters" to inform what our Legislature meant. *Utah Stream Access*, 2017 UT 82, ¶¶ 16–17 (citation omitted). We noted that the federal definition of navigable waters is "substantially equivalent" to our own. *Id.* ¶ 19. We observed that "[t]he parallelism in terminology is striking" and that "[t]he key operative terms of both standards, moreover, are identical." *Id.* ¶ 20. Accordingly, we concluded that "[t]he striking parallelism between the statutory definition and the federal standard is an indication that our legislature was adopting the 'cluster of ideas' in federal law." *Id.* ¶ 21.[13]

¶45 The idea that use of similar language indicates a legislative intent to adopt not just the language of a federal statute, but also its

---

[13] In *Utah Stream Access*, we "interpret[ed] the Public Waters Access Act to incorporate the federal standard of navigability," but characterized the district court's "reliance on federal cases" as "harmless error." *Utah Stream Access Coal. v. Orange St. Dev.*, 2017 UT 82, ¶ 18, 416 P.3d 553; *see also id.* ¶ 27 ("[A]ny error in the district court's decision to look to federal law was harmless."). The district court appeared to conclude that federal law governed the question of navigability and applied federal case law on that basis. We concluded that "the question of 'navigability' under the Public Waters Access Act is decidedly a question of state law." *Id.* ¶ 16. But we also reasoned that the state law standard "essentially mirror[ed] or incorporate[d] the federal standard," *id.* ¶ 18, and therefore looked to the federal standard to inform our interpretation of state law, *id.* ¶ 21.

accompanying "cluster of ideas," *id.*, dovetails with the approaches other states have employed. Accordingly, we conclude that, absent evidence of a contrary legislative intent, when our Legislature copies a federal statute, federal interpretations of the statute constitute persuasive authority as to the statute's meaning.

¶46 Here, section 20 is a carbon copy of section 45. Because of this similarity, and in the absence of any other signal from the Legislature about how this language should be interpreted, it is proper to look to the history and purpose of section 45 to guide our interpretation of section 113. And the "striking similarity" between the two statutes is best interpreted as a legislative signal that section 20 should function like section 45. That is, the Legislature enacted this provision to combat transfer pricing manipulation and to prevent affiliated corporations from gaining a tax benefit by engaging in transactions with each other for goods or services for prices above or below the current market, by the shifting of profits through the making of fictitious sales, and by taking advantage of questionable sales to each other.

¶47 In other words, because section 113 shares section 45's language, we look to the federal interpretation for guidance in resolving the ambiguity in the statute. And "necessary . . . clearly to reflect the income of any of such corporations," UTAH CODE § 59-7-113, means, as it does in its federal analog, that allocation is "necessary" in circumstances when related companies enter into transactions that do not resemble what unrelated companies dealing at arm's length would agree to do.

## IV. The District Court's Application of the Arm's Length Standard

¶48 After interpreting the statute, the district court applied it. The district court acknowledged the unique nature of the See's-Columbia transaction: "The Court believes See's had an uphill task . . . establishing an arm['s] length transaction. After all, it seemed conveniently owned by the same company that owned a non-income tax company." However, after considering the expert testimony and See's transfer pricing study, the court concluded that "the transfer was arm's length[,] justifying a deduction not barred under [Internal Revenue Code] section 482 and therefore not barred under Utah Code Annotated section 59-7-113."

¶49 The Commission does not challenge the district court's factual findings. Accordingly, because we conclude that the district court correctly ruled that the Legislature intended that section 113 be

interpreted with reference to its federal counterpart, we affirm the district court's decision.

## V. Additional Arguments

¶50 The Commission and the MTC make several additional arguments aimed at convincing us that the district court got it wrong. The Commission first argues that we "noted the breadth of the Commission's authority under section 113" in *Continental Telephone Co. v. State Tax Commission*, 539 P.2d 447 (Utah 1975). And that breadth of authority aligns better with a reading of the statute that, according to the Commission, authorizes the Commission to determine, in its sole discretion, when allocation is "necessary . . . clearly to reflect the income."

¶51 Specifically, the Commission argues that the following language from *Continental* supports its position:

> We think the broad wording of [section 113's predecessor] indicates a legislative intent to cover all situations dealing with either direct or indirect corporate affiliates without regard to whether they file individual state or consolidated state corporate franchise tax returns; and that the language of that section authorizes the Tax Commission to so apportion income and deductions of corporations within such controlled groups as to fairly and equitably reflect the income earned in Utah.

*Id.* at 451.

¶52 This language does indicate that the Commission should be granted broad authority to allocate income. However, this authority is not unlimited. As discussed above, *supra* ¶¶ 39–47 the better reading of the statute limits the application of section 113 to situations where related companies enter transactions on terms that unrelated companies would not agree to. Once the Commission has made that determination, it possesses broad authority to allocate income. But we do not read *Continental* to support the proposition that the Legislature intended the Commission to exercise its section 113 discretion untethered to any identifiable standard.[14]

---

[14] It is worth noting that *Continental* did not explicitly examine the meaning of "necessary . . . clearly to reflect the income."

¶53  Next, the Commission argues that "[s]ection 113 and I.R.C. [section] 482 differ in language and in context of application." The Commission first highlights that several linguistic and "minor grammatical" differences now exist between section 113 and section 482.[15] Additionally, section 482 now allows the Secretary to distribute, apportion, or allocate credits and allowances in addition to gross income and deductions, and also contains a provision referencing intangible property. *See* 26 U.S.C. § 482.[16] However, the Commission fails to explain how these differences affect the meaning of the section 482 in a manner relevant to our analysis of section 113.

¶54 At the time that section 113 was originally adopted as section 20, the Legislature adopted the language wholesale from the federal tax code. And that aspect of section 113 has remained unchanged. That Congress has since added provisions clarifying section 482's application that do not substantively alter the language at issue here does not persuade us that we should afford section 113 a different interpretation.

¶55  The Commission also contends that "[e]ven if the language of section 113 was identical to I.R.C. [section] 482, they operate differently because of differences between the Utah and Federal tax codes." The Commission points to the federal government's "affiliated group" consolidated return requirement and explains that Utah's tax scheme operates differently because the Utah Code combines entities that form a "unitary group."

¶56 The Commission explains that "[t]he federal government and some other states have taken a different approach [than Utah] by taxing the income of insurance companies." And the Commission argues that "the current case is one circumstance where combined reporting does not net out the effect of intercompany transactions," and thus "[s]ection 113's existence suggests that the Legislature foresaw that there could be circumstances where transactions distort

---

[15]  The Commission explains that "[s]ection 113 discusses 'corporations,' 'whether or not organized or doing business in this state,'" while section 482 "governs 'organizations, trades or businesses' 'whether or not incorporated, whether or not organized in the United States.'"

[16] "In the case of any transfer (or license) of intangible property (within the meaning of section 367(d)(4)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." 26 U.S.C. § 482.

income or deductions or they cause the evasion of taxes[,] and it wanted the Commission to be able to reallocate income to clearly show it." But this statement does not adequately explain why the differences between affiliated and unitary groups support the Commission's interpretation of section 113. Without more, we are unpersuaded that section 113 and section 482 differ in their context and application or that those differences would be material to our analysis.[17]

¶57 Finally, the MTC argues that there are several indications that the Legislature did not intend for section 113 to be interpreted in harmony with section 482 and its regulations. The MTC does not rely on the plain language argument that the Commission makes. Nor does it directly engage with the history of the language that the Legislature imported into our code.

¶58 Instead, the MTC first argues that because the arrangement between See's and Columbia does not reduce See's federal taxes in the same way it reduces its state taxes, section 482 would not apply. The MTC points out that "the IRS would not need to apply [section] 482 to eliminate related-company deductions in analogous circumstances where federal taxes *would* be affected." The MTC argues that if section 482 would not apply to See's federal taxes in this situation, the Legislature must not have intended that section 113 be construed with reference to its federal analog. And if this was the only evidence that spoke to the possible meaning of section 113, it might have some persuasive force. But, as we outlined above, an abundance of evidence, rooted in the language and history of the statute, demonstrates that at the time the Legislature inserted this language into our code, it intended to adopt the "cluster of ideas" associated with the language it lifted from the federal statute.

¶59 Second, the MTC argues that two policy choices our Legislature made—to require formulary apportionment and combined filing—demonstrate "a fundamental choice to reject the use of transactional accounting as the means for . . . accurately determining income of a multistate business earned within the state,

---

[17] Likewise, the Commission's cursory assertion that the United States Supreme Court "distinguished the unitary business principle from the arm's length approach employed by the federal government," supported only by a reference to *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 165, 184 (1983), sheds no light on how we should interpret section 113.

and determining the income of related companies participating in a single enterprise." The MTC suggests that the arm's length transaction standard, a method of transactional accounting, is inconsistent with Utah's formulary apportionment scheme. The MTC also asserts that "Utah's long-standing policy choices favoring formulary apportionment and combined filing over the sole alternative—transactional accounting—bear directly on the question of what it means to 'clearly reflect income' under [section 113]." But the MTC provides no support for its implicit assertion that the Legislature could not have decided that it wanted a section 113 with an arm's length standard to coexist with its other policy choices. This argument does not persuade.

¶60 Third, the MTC argues that "[s]tate tax agencies may have authority under state law to remedy potential distortions in income caused by related company transactions, similar to the arrangement in this case, by eliminating the effects of those transactions entirely." The MTC explains three general approaches: combined filing, add-back statutes, and taxing the income of the transferee apportioned by reference to the related transferor. And the MTC emphasizes that "these approaches are described here not because [the MTC] contends that they specifically apply to See's, but because all three approaches come to the same result—and therefore demonstrate the accepted standard for clear reflection of income under [section] 113."

¶61 We understand the MTC to argue that states have employed various other mechanisms to prevent related companies from reducing their tax liability by engaging in strategic intercompany transactions. And the Legislature may decide to implement these other mechanisms in the future should it wish to prevent companies like See's from receiving favorable tax treatment from transactions like the one at issue here. But we do not see great interpretive value flowing from the recognition that other states have found ways other than an arm's length transaction standard to curb enthusiasm for these types of related company arrangements.

## CONCLUSION

¶62 The district court correctly concluded that section 59-7-113 is ambiguous. And the district court properly sought interpretive guidance from section 113's federal counterpart and its regulations. The Legislature borrowed the phrase "necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such corporations" from federal tax law. The "cluster of ideas" associated with that language requires an examination of whether a transaction between related corporations yielded a result similar to one that two

unrelated companies would reach. Accordingly, we conclude that the district court did not err in employing the arm's length transaction standard to determine that the Commission improperly allocated See's income. Affirmed.

————————