**2024 UT App 14**

# THE UTAH COURT OF APPEALS

LABOR COMMISSION, ANTIDISCRIMINATION AND LABOR DIVISION;
NATALIE SACKS; AND DEVON SACKS,
Appellees,
*v.*
FCS COMMUNITY MANAGEMENT AND
ROSECREST COMMUNITIES MASTER HOA,
Appellants.

Opinion
No. 20210698-CA
Filed February 1, 2024

Third District Court, Salt Lake Department
The Honorable Patrick Corum
No. 190909481

Robert C. Keller, Nathanael J. Mitchell, Luisa R.
Gough, and Melinda K. Bowen,
Attorneys for Appellants

Sean D. Reyes, Erin T. Middleton, and Scott G.
Higley, Attorneys for Appellees

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1      This case presents the question of whether a homeowner
association constructively denied an accommodation request for
comfort chickens when keeping poultry was expressly prohibited
by the community's covenants. On stipulated facts, the district
court ruled that the homeowner association constructively denied
the accommodation, and, as a result, the court confirmed
damages, attorney fees, a civil penalty, and remedial relief. We

conclude, however, that there was no constructive denial under the facts of this case and reverse the decision of the district court.

## BACKGROUND[1]

¶2    Natalie and Devon Sacks wanted a home in an area where backyard chickens were allowed, both to ensure a supply of fresh eggs and to provide an opportunity for their children to learn responsibility. Natalie has a medical condition—reactive hypoglycemia—that requires her to have fresh eggs.

¶3    The Sackses purchased a house, located on a .28 acre lot, in Herriman, Utah, in July 2016. The property was part of a subdivision governed by the Rosecrest Communities Master HOA, which contracted with FCS Community Management to perform financial and administrative functions within the subdivision (collectively, HOA). The property was subject to the HOA's governing documents, including a "Declaration of Covenants, Conditions, and Restrictions" (CC&Rs).

¶4    The relevant section of the CC&Rs provided that each residence was limited to "three animals or two of the same kind of animal," and only those specifically listed. Significantly, "[f]or the avoidance of any doubt," the CC&Rs pointed out that "chickens or other poultry" were "not allowed" because they were not among the "ordinary and specifically listed household pets." Despite being provided a copy of the CC&Rs at the time of purchase, the Sackses stated that they did not review the CC&Rs or consult with anyone on the HOA board to determine if chickens were allowed.

---

1. For the most part, the background section, including the quoted statements, is drawn from the set of facts to which the parties stipulated before the district court. *See infra* ¶ 24.

¶5    The Sackses purchased eight chickens in January 2018. While the birds were initially bought to provide fresh eggs to address Natalie's medical condition, the Sackses soon discovered that the chickens had a positive impact on their daughter, who has a sensory processing disorder that results in tactile, aural, visual, and thermal hypersensitivity. This condition causes her to become easily overwhelmed and withdrawn. And the Sackses noticed that their daughter formed a bond with the chickens, which allowed her to improve in school, advance socially, and reduce her levels of anxiety and insecurity.

¶6    But the neighbors didn't share the Sackses' fondness for the chickens. In early April 2018, a neighbor notified the HOA's subdivision manager that the Sackses had chickens and asked that they be notified that chickens were on the CC&Rs' forbidden-animal list.[2]

¶7    On April 10, the manager sent the Sackses a "Courtesy Notice" informing them that they were not allowed to keep chickens under the CC&Rs. The notice asked the Sackses "to remove the chickens immediately or face potential fines." Two days later, another neighbor complained to the manager "about the smell and noise from the chickens."

¶8    On April 13, Natalie emailed the manager to request a "variance" to the CC&Rs to allow them to keep all eight chickens. The request "did not mention a disability or a disability-related need for the chickens."

---

2. At this point in the sequence of events, the timing of correspondence between the HOA and the Sackses plays a central role in this case. Accordingly, we include specific dates in our recitation of the facts.

¶9    On April 17, the HOA denied the request for a variance. The manager "explained that the CC&Rs specifically mentioned chickens as not being allowed in the community."

¶10    On April 18, Natalie "responded by stating that her property was large enough that health and noise concerns would be mitigated, and again asked for a variance." Her response again did not mention a need for the chickens related to any disabilities.

¶11    On April 20, the manager reiterated "that the HOA would not grant a variance for the chickens." Natalie responded to the manager on the same day, stating for the first time that the family had a disability-related need for the chickens and explaining that she needed the chickens for two reasons. First, Natalie said her medical condition required her to have fresh eggs supplied by the chickens. Second, citing her daughter's disabilities, Natalie asserted that the chickens had helped her daughter "improve in school and socially." Accordingly, Natalie "stated that she was requesting that the HOA reconsider the denial on the basis of the chickens' positive health impact on both her and her daughter."

¶12    On April 23, the manager responded that the variance was still denied. On the same day, Natalie renewed her request for a variance, but this time she cited the Utah Fair Housing Act (UFHA), *see* Utah Code §§ 57-21-1 to -14, and requested that all eight chickens be allowed to "remain as assistance animals" as a "reasonable accommodation" for her and her daughter's "disabilities."

¶13    On May 3, the manager responded by asking for a note from a doctor supporting the need for the chickens as an accommodation. And on May 8, Natalie provided the manager with a letter from a licensed clinical mental health counselor stating that the daughter "suffered from post-traumatic stress disorder" and noting that "since the chickens had arrived, [the

daughter's] anxiety episodes and general sense of insecurity had decreased significantly and her mental state had vastly improved." The counselor "also stated that removal of the chickens would be detrimental to the mental well-being" of Natalie and her daughter.

¶14 From May 8 until July 5, no communication between the parties occurred. But during this entire time, all eight chickens remained on the Sackses' property.

¶15 After receiving the counselor's note on May 8, "the HOA performed a review of the request for accommodation to determine whether it was required to grant a reasonable accommodation for the chickens." This review examined the "potential health and safety of the surrounding neighbors" through (1) "an analysis of the slope and drainage plan for the [Sackses'] property and surrounding lots to assess the consequences of potential runoff of chicken waste from the [Sackses'] property to adjoining properties during rain or water sprinkler use" and (2) "a consideration of a potential rodent problem as the [Sackses'] neighbors had informed the HOA of mice problems since the introduction of the chickens into the neighborhood."

¶16 "After analyzing the health and safety concerns of the neighborhood, the HOA attempted to determine whether the [Sackses] had provided a sufficient justification for maintaining all eight chickens, or whether the request for accommodation could be satisfied with a smaller number of chickens." To that end, the HOA attorney emailed Natalie on July 5 "to confirm the number of chickens she intended to seek as assistance animals." That same day, Natalie confirmed the number was eight, all hens.

¶17 By late July, the HOA had completed its review and had made a decision: it would offer, as an accommodation, to allow

the Sackses to have two chickens. On July 25, the HOA sent Natalie an accommodation letter, explaining that the family would be allowed to have two chickens but no roosters, as long as the family complied with regulations regarding coop maintenance and took measures to reduce odor, unsightliness, rodents, noise, and other nuisances.

¶18 Shortly thereafter, Natalie "responded that the accommodation needed to be amended to include all eight chickens" because her daughter "was bonded to each hen."[3]

¶19 On August 1, the HOA attorney spoke with the counselor regarding the daughter's "individualized need for each specific hen." The counselor "stated she could not opine on the specific necessity of each hen but did identify that [the daughter] had formed a particular bond with one of the chickens." And on August 7, Natalie submitted a letter to the HOA from her daughter's pediatrician in support of the "request for the chickens as assistance animals." The pediatrician indicated that Natalie's daughter "was diagnosed with anxiety and PTSD, and that the chickens were a part of her treatment for managing her anxiety symptoms." The next day, the HOA attorney called the pediatrician "to inquire as to the number of chickens" the daughter "required as an accommodation for her disabilities." The pediatrician did not opine on the precise number of chickens the daughter needed but stated that the daughter "had bonded particularly with one chicken and that the removal of any of the chickens would increase [her] stress."

¶20 On August 9, the HOA attorney informed Natalie "that the HOA's offer for a reasonable accommodation was to allow two chickens to stay." Natalie held fast, insisting "that they could not

---

3. The stipulated facts do not provide the date of this communication, but the sequence of events indicates that it had to be between July 25 and August 1.

get rid of any of their chickens and that the accommodation needed to be for all eight chickens." The parties had "additional communications reiterating these same positions." But the Sackses refused to comply with the HOA's accommodated position that they reduce the number of chickens from eight to two. As a result, on August 15, the HOA issued a $25 fine to the Sackses for violating the CC&Rs.

¶21 A few months later, knowing that the HOA refused to allow them to keep all eight chickens, the Sackses sold their house and moved out of the subdivision. The $25 fine was collected at the closing of the sale.

¶22 On February 19, 2019, the Sackses filed a claim with the Utah Antidiscrimination and Labor Division (UALD) alleging that their daughter had been harmed by a discriminatory housing practice. UALD interviewed six witnesses and reviewed the parties' communications before issuing its final report and order in November 2019. UALD determined that the HOA's "unwarranted delay in processing" the Sackses' "reasonable accommodation request and failure to substantially engage in the interactive process" constituted "a constructive denial of reasonable accommodation prior to July 25, 2018." But UALD also concluded that the HOA "did not deny" the Sackses' "reasonable accommodation request" in allowing only two chickens from July 25 forward. Despite finding that the HOA's offered accommodation was reasonable, UALD proceeded to award the Sackses attorney fees and damages. UALD also assessed a fine against the HOA, along with requiring HOA leaders to "attend fair-housing training" and implement certain measures to ensure future compliance with the UFHA regulations for reasonable accommodation requests.

¶23 UALD filed a complaint on behalf of the Sackses asking for de novo review of UALD's determination that the HOA violated

the UFHA.[4] Specifically, the Sackses asked the court to "adopt" UALD's report, confirm the award of the fees and damages, and order the HOA to take the remedial actions to prevent future discriminatory actions. The HOA moved for summary judgment, arguing that because the Sackses were not denied a reasonable accommodation, their claim of discrimination in violation of the UFHA failed as a matter of law. Specifically, the HOA argued that (1) the Sackses' request for an accommodation of eight chickens was unreasonable; (2) the HOA did not deny, either constructively or actually, the request for accommodation; (3) the Sackses "were not denied the possession, use, or benefit of their chickens" during the time period in which the HOA was reviewing the matter; and (4) the HOA had not acted in bad faith or with discriminatory intent during the two-month period of review. The district court denied the motion for summary judgment, reasoning that while the facts were not in dispute, there remained a "reasonable inference based upon [those] facts that there was a constructive denial."

---

4. When UALD issues a written determination after investigating a discriminatory housing practice complaint, "a party to the complaint may obtain de novo review of the determination by submitting a written request for a formal adjudicative hearing" before the Utah Labor Commission's Division of Adjudication. Utah Code § 57-21-10(1)(a). After this review has been requested, "any party to the complaint may elect to have the de novo review take place in a civil action in the district court rather than in a formal adjudicative hearing with the Division of Adjudication." *Id.* § 57-21-10(2)(a). That is what happened here: the Sackses, even though they were granted the accommodation by UALD, sought judicial review of UALD's determination, essentially asking the district court to confirm it. UALD provided legal representation to the Sackses because it found substantial evidence supported its determination that discriminatory practices had occurred. *See id.* § 57-21-10(3).

¶24 The parties subsequently submitted a "list of stipulated facts and [a] legal question presented for the purpose of narrowing the issues to be determined" by the court. The sole legal question identified by the parties was "whether the [Sackses'] request for a reasonable accommodation was constructively denied based on the . . . stipulated facts."

¶25 Relying on reasoning from the federal courts, the district court stated that the Sackses, as the parties "seeking to assert a claim that they were denied a reasonable accommodation," had to establish five elements: (1) that they "suffer[ed] from a disability as defined" by the UFHA, (2) that the HOA "knew or reasonably should have known of [their] disability," (3) that the Sackses "need[ed] accommodation to have an equal opportunity to use and enjoy [their] dwelling," (4) that "the accommodation [sought] is reasonable," and (5) that the HOA "refused to make such accommodation." *See Haws v. Norman*, No. 15–cv–00422, 2017 WL 4221064, at *4 (D. Utah Sept. 20, 2017).

¶26 The court concluded that, because the first three elements of the claim were not in dispute, the "question presented to [the court was] whether [the HOA's] failure to communicate or otherwise engage with the [Sackses] for approximately two months constituted a constructive denial of a reasonable request."

¶27 The court noted that the HOA had also argued that the Sackses' request for an accommodation to keep all *eight* chickens was unreasonable. But the court observed that the argument was not properly before the court because it fell outside the scope of the stipulated legal question, which was limited to whether the "request for a reasonable accommodation was constructively denied." But even if the reasonableness of requesting an accommodation for all eight chickens was "considered part of the stipulated question," the court observed that this would not affect the resolution of the constructive denial issue for two reasons.

¶28　First, the court interpreted the stipulated facts to show that the request was supported by "unchallenged evidence" that the daughter needed to keep all eight chickens because she "had a bond with *each* of the chickens" and "the providers specifically stated that removing even one chicken would increase [her] stress." And the court observed that there was "scant evidence" that keeping all eight chickens "would have resulted in a significant negative impact" on the subdivision or the neighbors. Based on this, the court concluded that the Sackses' request for all eight chickens was reasonable.

¶29　Second, in a constructive denial context, the court noted the following:

> [Delays deny] the requesting party . . . the requested accommodation even if a reasonable alternative or compromise is later offered. . . . In cases where the request is patently unreasonable, there may ultimately be no harm from a denial or a delay. That is not the case, however, where the request is arguably reasonable or the requesting party has made an initial showing that the request is reasonable and necessary (and in this case, the [court] finds that the request was reasonable). To allow the [HOA] or housing provider to unduly delay their response to a potentially meritorious request would thwart the purposes of the [UFHA] by effectively denying the requesting party the accommodation without any stated justification. A constructive denial claim[5] exists to prevent that

---

5. The notion of a "constructive denial claim" is not helpful and has led to confusion by implying that there is a standalone claim for damages for constructive denial. In fact, the proper claim is for injunctive relief and damages arising from a "discriminatory

(continued…)

from occurring. Thus, where a constructive denial claim is asserted, the [court] believes that the complainant need only show that the initial request was arguably reasonable rather than showing that the request ultimately was or would have been deemed reasonable.

¶30　The court then turned to the issue of whether (in this case) the requested accommodation was constructively denied. It noted that the HOA, as the housing provider, was under no obligation to immediately grant the request for the accommodation. *See Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1285–86 (11th Cir. 2014) ("The [federal] FHA does not demand that housing providers immediately grant all requests for accommodation."). "But," the court ruled, "the state and federal fair housing acts do not allow a housing provider to effectively deny the claim for a time by ignoring the request or delay responding. Instead, they must 'participate in an interactive process' to evaluate the request and 'discuss the need for the accommodation and possible alternatives.'" (Quoting *Astralis Condo. Ass'n v. Secretary, U.S. Dep't of Housing & Urban Dev.*, 620 F.3d 62, 68 & n.3 (1st Cir. 2010).)

¶31　Here, the court concluded that a "review of the stipulated facts" showed that the "requisite interactive process or dialogue did not take place." After receiving the initial request and obtaining the requested documentation, the HOA did not contact

---

housing practice" consisting of "a refusal to make a reasonable accommodation in a rule, policy, practice, or service when the accommodation may be necessary to afford the person equal opportunity to use and enjoy a dwelling." *See* Utah Code §§ 57-21-11(1), -5(4)(b). Rather than a separate cause of action, constructive denial more accurately describes one possible means by which a request for reasonable accommodation might be denied.

the Sackses for nearly two months. And even when the HOA made contact, "there was not meaningful dialogue." Rather, the HOA asked Natalie to confirm the information that it already had (namely, the number of chickens the Sackses wanted to keep). This inquiry from the HOA was followed by another three weeks of silence. The court concluded,

> Thus, for almost three months, [the HOA] had only one brief contact with the [Sackses], and that contact merely sought information that had already been provided. Such limited contact by [the HOA] clearly falls short of an actual dialogue with the [Sackses] and does not constitute the type of interactive process or discussion of the request that is required. Consequently, that unjustified delay, accompanied by the lack of dialogue or an interactive process is sufficient to show that [the HOA's] delay in responding to the [Sackses] was unwarranted and that [the HOA] constructively denied the [Sackses'] request during that time.

¶32   The court allowed UALD's order to stand, ordering the HOA to pay $1,750 in damages, $9,360 in attorney fees, and a $1,000 civil penalty. The court additionally instructed the HOA to take remedial actions to prevent future UFHA violations. The HOA appeals.

ISSUE AND STANDARD OF REVIEW

¶33   The HOA claims that the district court erred "when it determined that [the HOA] constructively denied the request for accommodation based on the absence of communications" over a nearly three-month period. "[T]he question of whether a set of facts falls within a legal standard is itself a question of law." *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 33, 308 P.3d 461. Even if we considered this a mixed question, we would still review it

for correctness because the question is more law-like than fact-like. *Id.* ¶¶ 36–39. This is especially true when the issue is submitted to the district court on stipulated facts. *Id.* ¶ 40.[6]

## ANALYSIS

¶34 The UFHA states that "a refusal to make a reasonable accommodation in a rule, policy, practice, or service when the accommodation may be necessary to afford [a person with a disability] equal opportunity to use and enjoy a dwelling" constitutes a "discriminatory housing practice." Utah Code § 57-21-5(4)(b).

¶35 This language is materially the same as its federal counterpart. *See* 42 U.S.C. § 3604(f)(3)(B) ("[D]iscrimination includes . . . refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a person with a disability] equal opportunity to use and enjoy a dwelling . . . ."). When the "language and apparent policy" of the UFHA are substantially the same as the federal Fair Housing Act (FHA), "it is appropriate to look to federal law as persuasive authority" for interpreting

---

6. The HOA raises two other issues on appeal. First, it claims that the district court erred when it determined that constructive denial can "occur in the absence of evidence of bad faith or discriminatory intent" under the UFHA. Because we resolve this case by determining that there was no constructive denial, we need not address this issue.

Second, the HOA asserts that the district court erred in concluding that the HOA "constructively denied" the Sackses' request for accommodation, even though the Sackses "failed to meet their burden of showing the request was both necessary and reasonable." Again, given our resolution of this case, we need not address this issue.

Utah's act. *Malibu Inv. Co. v. Sparks*, 2000 UT 30, ¶ 27 n.11, 996 P.2d 1043; *see also Utah State Tax Comm'n v. See's Candies, Inc.*, 2018 UT 57, ¶ 47, 435 P.3d 147; *Brixen & Christopher Architects, PC v. State*, 2001 UT App 210, ¶ 33, 29 P.3d 650.

¶36 As outlined in our recitation of the facts, UALD determined that the HOA constructively denied the Sackses' request for a reasonable accommodation for two reasons: (1) there was "unwarranted delay in processing" the Sackses' "reasonable accommodation request" on the part of the HOA and (2) the HOA failed to "substantially engage in the interactive process" during the time it took to reach its decision. But because the HOA eventually made a decision regarding the reasonable accommodation, UALD cabined the period of constructive denial to the period from when Natalie invoked the UFHA as the basis for the accommodation to when the HOA notified the Sackses of its decision (April 23, 2018, through July 25, 2018).[7]

¶37 UALD argues that a constructive denial is a "refusal to make a reasonable accommodation" under the UFHA. Subsequent remedial actions, UALD argues, including an express accommodation or a partial accommodation, would not change the fact that a "refusal" had occurred.[8] Accordingly, UALD argues

---

7. We asked the parties for supplemental briefing on several issues, including whether a failure to engage in an interactive process can constitute a standalone cause of action for damages. Both parties agreed it cannot. To be clear, UALD asserts that a failure to engage should be considered in determining whether a request for a reasonable accommodation has been constructively denied.

8. No Utah cases construing the UFHA have so held. Instead, UALD relies on federal cases construing the FHA. *See, e.g., Groome Res. Ltd., LLC v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000)

(continued…)

that a constructive denial is not a standalone claim but instead an alternative way a claimant can show that a request for an accommodation was denied.

¶38    But we need not answer the question of whether to define constructive denial along the lines UALD advocates, because even if such a thing existed, it would not be present here. The facts of this case do not support the conclusion that there was any unwarranted delay in evaluating the request or that the HOA failed to engage in an interactive process while it was coming to a decision regarding the Sackses' request for reasonable accommodation.

¶39    A fairly recent federal case took up the issue of constructive denial when the requested accommodation was eventually given and the party was allowed full use of the requested accommodation during the pendency of the decision-making process. *See LaRosa v. River Quarry Apartments, LLC*, No. 18-cv-

---

("This denial can be both actual or constructive, as an *indeterminate delay has the same effect as an outright denial*. In the instant case, the district court was well within its discretion to decide that a reasonable accommodation was denied by the unjustified delay of the [housing authority]." (emphasis added)); *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 602 (4th Cir. 1997) ("Under the [FHA], however, a violation occurs when the disabled resident is first denied a reasonable accommodation, *irrespective of the remedies granted in subsequent proceedings*." (emphasis added)); *United States v. District of Columbia*, 538 F. Supp. 2d 211, 219 (D.D.C. 2008) ("The [FHA] is violated when a reasonable accommodation is first denied, regardless of remedial steps that may be taken later."); *accord Arnal v. Aspen View Condo. Ass'n*, 226 F. Supp. 3d 1177, 1186 (D. Colo. 2016).

00384, 2019 WL 3538951 (D. Idaho Aug. 3, 2019).[9] Robert LaRosa applied to live in an apartment that charged an additional fee for residents who owned a dog. *Id.* at *1. LaRosa requested an accommodation to keep his dog without paying the fee, and he presented a note from a nurse practitioner stating that LaRosa needed the dog to "help manage his post-traumatic stress disorder." *Id.* (cleaned up). About a week later, LaRosa received an email approving his residence application, but the email stated the request for the assistance animal was still in process and required additional documentation. *Id.* LaRosa immediately completed and returned the forms and moved into the apartment with his dog about a week later, with approval for the accommodation still pending. *Id.* at *2. About two weeks later, the apartment manager wrote a letter to LaRosa stating that the accommodation was denied because the need for an assistance animal could not be verified. *Id.* at *3. After additional communication with LaRosa's doctor, the apartment complex changed course and granted the accommodation. *Id.* at *4. In all,

---

9. Insofar as we can tell from our review of the record and briefing, neither party cites this case. Nevertheless, its fact pattern matches well with the facts at hand. And it is one of the few cases—in fact, the only one on point that we have been able to find—that takes on the issue of constructive denial in situations where the housing authority allows the resident to have the accommodation before ultimately granting the accommodation after completing its own review process.

We found one other case, not cited by the parties, that deals with a constructive denial when the accommodation was granted and the requester was allowed to keep the animal during the interim. *See Conlin v. RU Cliff, LLC*, No. 17-cv-1213, 2019 WL 5788695, at *3, *5 (D. Utah Nov. 6, 2019). But this case involved only a six-day delay period, which the court concluded did not constitute an "indeterminate delay" sufficient to support constructive denial of a reasonable accommodation request. *Id.* at *5 (cleaned up).

it took forty-five days for the apartment complex to grant the accommodation after the initial request was made. *Id.* at *8. LaRosa moved out of the apartment about four months later, stating that the experience caused him "to feel embarrassed, untrusted, humiliated and unwelcome." *Id.* at *4 (cleaned up). He later filed a claim under the federal FHA, alleging, among other violations, that the apartment complex failed to reasonably accommodate his disability during the period before his request was ultimately granted. *Id.* at *5–6.

¶40 The court ruled that LaRosa's claim failed because he had not "sufficiently alleged" that the apartment complex "refused to make the requested accommodation." *Id.* at *5. More specifically, the court "concluded that no denial had occurred because even though the accommodation was not formally granted" for forty-four days, the dog was "allowed to live with" LaRosa from the day he moved into the apartment until he moved out. *Id.* at *6. The court also noted that during the accommodation review period, LaRosa was not (1) "fined or otherwise punished" for the dog's presence, (2) told to remove the dog, (3) required to pay the pet fee, or (4) told he had to leave the apartment. *Id.*

¶41 The court also specifically addressed constructive denial as it related to the reasonable accommodation request. *Id.* at *8. The court explained that a "defendant constructively denies an accommodation request when an unjustified and indeterminate delay has the same effect of undermining the FHA's anti-discriminatory purpose as a formal denial." *Id.* The court went on to note that "in constructive denial cases, an applicant is typically left in limbo for a lengthy period while the housing provider stonewalls." *Id.* But here, the court stated that the apartment complex "was entitled to seek more specific information" to allow it "to determine that . . . LaRosa suffered from a disability as defined by the FHA, that an emotional support animal was a needed accommodation, and that there was a relationship between the disability and the accommodation." *Id.* The court

determined that forty-five days was not too long for the apartment complex to conduct this review. *Id.*

¶42 Another case, on which the *LaRosa* court relied, *see id.* at \*6, is helpful in our analysis. In *Dubois v. Association of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175 (9th Cir. 2006), some apartment owners lived in a complex with bylaws that prohibited all pets except assistance animals for disabled residents. *Id.* at 1177. The owners brought home a dog and requested a reasonable accommodation to allow them to keep it. *Id.* at 1177–78. They submitted letters from doctors stating that one of the owners "suffered from depression, that he would benefit from animal-assisted therapy, and that separation from [the dog] would exacerbate his condition." *Id.* at 1178. The complex granted temporary permission for the owners to keep the dog. *Id.* Before the complex took any further action, the owners filed a lawsuit alleging violations of the FHA and its state counterpart. *Id.*

¶43 Even though *Dubois* was not framed as a constructive denial case, its reasoning nevertheless applies well to the Sackses' case. In particular, the *Dubois* court stated,

> Although the parties have argued various issues at length, there is a simple answer here. The [complex] never required [the dog] to leave and thus never refused to make the requested accommodation, which is one of the essential elements of the FHA claim. [The owners] kept [the dog] from the day they brought him home in January 2000 until the day they vacated their unit in September 2003. . . . Since the [complex] never refused to make the requested accommodation, [the owners'] FHA claim necessarily failed.

*Id.* at 1179.

¶44     Here, using similar reasoning as articulated in *LaRosa* and *Dubois*, we conclude that—prior to July 25—the HOA never refused to make the Sackses' requested reasonable accommodation, either through constructive or actual denial.

1.     Communication After Receiving the Accommodation Request

¶45     Contrary to UALD's characterizations, the timeline was filled with relatively frequent activity on the part of the HOA, militating against a conclusion that the HOA's silence in response to the Sackses' accommodation request implied denial. If anything, the periods of non-communication indicated that the HOA was evaluating factors necessary to grant the request.

¶46     Natalie first made a UFHA accommodation request on April 23. The HOA responded ten days later (May 3), saying that it needed a doctor's note supporting the need for chickens as an accommodation. On May 8, Natalie provided the note. After receiving the note, the HOA conducted a review of the accommodation request, which took fifty-eight days (May 9 to July 5). This review addressed three issues. First, the HOA sought "to determine whether it was required to grant a reasonable accommodation for the chickens." Second, it analyzed "the slope and drainage plan" of the Sackses' property relative to the surrounding lots to determine the potential consequences of "runoff of chicken waste" that might result from rain or sprinkler use. Third, it considered a "potential rodent problem" that had been raised by neighbors since the chickens' arrival. Obviously, the answer to the second and third inquiries would depend in large measure on how many chickens the Sackses wanted to keep. Specifically, as stipulated in the facts, "the HOA attempted to determine whether the [Sackses] had provided a sufficient justification for maintaining all eight chickens, or whether the request for accommodation could be satisfied with a smaller number of chickens." So, apparently having concluded that an

accommodation for at least some chickens was in order, the HOA asked the Sackses on July 5 about the number of chickens they needed. Natalie responded that they "intended to keep" all eight chickens "as emotional support animals." Twenty days later (July 25), the HOA sent the Sackses a letter allowing them to keep two hens—but not all eight—as an accommodation and directing them to take specific steps to mitigate concerns regarding odor, rodents, noise, and unsightliness.

### 2. Alleged Delay in Granting the Accommodation

¶47  We do not see the period from when the Sackses filed the UFHA accommodation request to when the HOA granted the accommodation to be unreasonably long, especially considering the three issues that the HOA explored during that time.

¶48  First, the HOA sought "to determine whether it was required to grant a reasonable accommodation for the chickens." Chickens as comfort animals is a relatively novel concept. Indeed, recent news stories indicate that while some groups recognize chickens as emotional support animals,[10] their status as such is

---

10. One organization involved in therapy animals observes that "[b]esides dogs and cats, there are a great many other species that make wonderful visiting animals and can form strong human-animal bonds," including birds, rabbits, domestic rats, hamsters, guinea pigs, ducks, chickens, goats, miniature pigs, llamas, cows, and horses. *Pet Suitability FAQ*, Intermountain Therapy Animals, https://therapyanimals.org/pet-suitability-faq [https://perma.cc/ UW5B-989Y]; *see also* Susie Kearley, *Therapy Chickens Combat Isolation and Loneliness*, Backyard Poultry, https://backyard poultry.iamcountryside.com/chickens-101/therapychickens-combat -isolation-loneliness [https://perma.cc/LBW8-8PUB].

less than clear and only recently becoming recognized.[11] We note these recent trends not to take a stand on the issue, but merely to indicate that the concept of comfort chickens might be news to many people. Given the dynamic status of this issue, we think it was entirely reasonable for the HOA to take a step back and spend a few weeks researching the status of chickens as support animals. Moreover, during this time frame, the HOA had to consider the other two concerns identified in the stipulated facts—chicken waste runoff and rodent complaints—and evaluate whether an accommodation could be made that addressed these potential problems.

3.      Alleged Harm Suffered by the Sackses

¶49    We also fail to see how the Sackses were harmed by the HOA's alleged delay in granting the accommodation.

¶50    First, the stipulated facts contain no indication that the HOA ever communicated to Natalie that her UFHA request for a reasonable accommodation was denied. Admittedly, the facts unequivocally indicate that the HOA initially denied the Sackses' request for a variance from the CC&Rs to allow them to keep chickens on three occasions (April 17, 20, and 23). But these denials arose from the bare request for a variance from the CC&Rs that was not made under the auspices of the UFHA. The HOA made no further denials of the Sackses' accommodation request *after* Natalie invoked the UFHA as the basis for reasonable accommodation. Rather, the HOA communicated to her that it needed information to determine how many chickens were

---

11. A city appeals board in Bangor, Maine, recently allowed a man to keep emotional support chickens even though the city had a no-chicken rule. *See* Sydney Page, *After Months-long Fight, Maine Man Can Keep Emotional Support Chickens*, Washington Post, https://www.washingtonpost.com/lifestyle/2023/10/17/emotional -support-chickens-maine-disabled [https://perma.cc/TQJ3-54BQ].

necessary to accommodate her daughter's disability. From this request, the Sackses could have inferred that an accommodation may soon be forthcoming but the accommodation might not be for everything (namely, all eight chickens) they had requested—given the HOA's question about how many chickens the Sackses intended to keep.

¶51     Second, the stipulated facts also indicate that the fine was imposed not because the Sackses had initially kept the chickens in violation of the CC&Rs but because they continued to keep more than the two chickens allowed by the HOA's accommodation communicated to them on July 25. While it is true that the HOA told the Sackses on April 10 that they could "face potential fines" unless they removed the chickens "immediately," the facts nowhere suggest that the Sackses were threatened with a fine during the pendency of the HOA's consideration of the accommodation made under the UFHA on April 23.

¶52     Third, the Sackses' accommodation request was never entirely denied—either constructively or actually. On the contrary, at least during the period in which the HOA was evaluating their request, the accommodation was granted in its entirety. The stipulated facts explicitly state that the Sackses were allowed to keep all eight chickens during the HOA's consideration of the accommodation request. This is a fact of no small import. It shows that the Sackses were given everything they requested during the pendency of the consideration period. If anything, by allowing the Sackses to keep all the chickens during this period, the HOA constructively accommodated rather than constructively denied the request. This period of constructive accommodation was followed by a partial actual accommodation on July 25 when the HOA communicated its decision to allow the Sackses to keep two chickens, not all eight, provided they mitigate the identified nuisance concerns.

¶53    In sum, the rubric of constructive denial simply does not fit the facts of this case. The request was ultimately granted, at least in part. The Sackses were allowed the benefit of their entire requested accommodation during the investigative period. And the HOA never punished—or even threatened to punish—the Sackses during the evaluation period. These facts do not support the position that the Sackses' accommodation request was ever constructively denied. Accordingly, we reverse the determination that the HOA constructively denied the Sackses' reasonable accommodation request.[12]

CONCLUSION

¶54    The HOA did not constructively deny the Sackses' reasonable accommodation request because (1) it allowed them to enjoy the benefit of their request during the pendency of the investigation, (2) it did not punish them for keeping the chickens during the interim period, and (3) it ultimately granted an accommodation that UALD found reasonable. This determination forecloses the award of damages, fees, or other relief.

¶55    Reversed.

_____

12. Our determination that the HOA did not constructively deny the Sackses' reasonable accommodation request necessarily forecloses an award of damages and attorney fees or ordering the remedial measures recommended in UALD's order.